# UNITED STATES DISTRICT COURT
# SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CATHERINE MAYER, | ) | Case No.: 1:17-cv-05613 |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| TIME, INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff CATHERINE MAYER ("Plaintiff"), by and through her undersigned attorneys, complains of Defendant TIME, INC. ("TIME") and in support respectfully alleges, upon information and belief, the following:

## NATURE OF THE ACTION

1.      This action is brought for discrimination and retaliation in employment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.* ("ADEA").  TIME has violated these laws by operating a system of male cronyism, by which men, especially former war correspondents, were favored over women in recruitment, dismissal and promotion decisions.  Plaintiff, a woman now 56, was personally damaged by this discriminatory practice.

In addition, Plaintiff brings a state law claim for misrepresentation on the basis of breached promises and representations made by TIME to induce Plaintiff to accept certain employment decisions, and to cover up the discriminatory nature of these decisions.

2.      Plaintiff also seeks costs and attorneys' fees authorized by Title VII and the ADEA.

**PARTIES**

3.      Plaintiff is a dual national, holding citizenship of both the United States and the United Kingdom.  She was born in the United States but currently resides in London, United Kingdom.  During the relevant period, and at all material times, Plaintiff was employed by TIME jointly with and/or through its wholly-owned and controlled subsidiaries Time Magazines Europe Limited ("TMEL") and TIME Atlantic Europe Holdings Limited ("Time Holdings").

4.      TIME is a domestic corporation, duly organized and existing under the laws of Delaware, with its principal place of business located at 225 Liberty Street, New York, New York 10281.

5.      TIME is an employer in an industry that affects commerce and employs 20 or more employees, qualifying as an employer for the purposes of Title VII under 42 U.S.C. § 2000e(b) and of the ADEA under 29 U.S.C. § 630(b).

6.      TIME is the parent corporation of about forty-six subsidiaries operating in four countries including TMEL and Time Holdings.

7.      Time Holdings is a wholly owned subsidiary of TIME.  TMEL is in turn a wholly owned subsidiary of Time Holdings.  TMEL and Time Holdings both have their registered address in the United Kingdom, at 3rd Floor, 161 Marsh Wall, London, E14 9AP.

8.      At all relevant times TIME, TMEL, and Time Holdings operated as a single-employer and integrated enterprise.  Whenever and wherever reference is made in this Complaint to any act by TIME, TMEL or Time Holdings, such allegations and reference shall also be deemed to mean the acts and failures to act of TIME acting individually, jointly, and/or severally.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, the ADEA, and Title VII.

10.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because, *inter alia*, TIME has its headquarters in this District and a substantial part of the unlawful employment practices alleged below occurred in this District.

## ADMINISTRATIVE PROCEDURES

11.      On August 19, 2015, Plaintiff timely filed a charge of employment discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC").

12.      Notice of a right to sue letter was issued by the EEOC to Plaintiff on April 28, 2017, and this Complaint is filed within 90 days of receipt of said notice.  A copy of the right to sue letter is attached hereto as Exhibit A.

13.      All conditions precedent to the maintenance of this suit and the Plaintiff's claims have occurred, been performed or are otherwise waived.

## GENERAL ALLEGATIONS

### *Plaintiff Establishes Herself as a Highly Reputed Journalist and Editor*

14.     Prior to her employment with TIME, Plaintiff was a highly regarded journalist and editor.  She began her career at the *Economist*, served as a deputy editor of two magazines, *Business Traveller* and *International Management*, and worked for eleven years as a foreign correspondent at the German news weekly *Focus*.  During her time at *Focus*, Plaintiff proved herself adept at writing in German as well as English and deeply connected in Germany, the UK, and the United States, the country of her birth.

### *Plaintiff Is Hired by TIME and Makes Significant Contributions*

15.     Plaintiff began working for TIME in 2004.  She was recruited for and assigned to TIME's London arm, TMEL.

16.     From 2005, and with the exception of a three-month period of unclear reporting lines in 2014, Plaintiff reported directly to line managers in New York during her employment with TIME.  Her work was edited in New York, and her ideas were pitched to and commissioned by those in New York, always with an eye to their relevance for the domestic edition (sold in the United States) as well as the Atlantic edition (sold in Europe, the Middle East and Africa) and other international editions.  TIME is quintessentially a United States brand with a global reach.

17.     Plaintiff threw herself into her work at TIME and became an asset to the company.  Her industry and achievements were recognized with numerous informal commendations, consistently outstanding performance reviews, and increasing responsibility.

18.     In 2006, Plaintiff was promoted to the role of London Bureau Chief.  In this role, she continued to report directly to Michael Elliott ("Elliott"), the International Editor in New York.  Plaintiff continued to report directly to Elliott after he was elevated to take on the

additional role of Deputy Managing Editor, second in the TIME hierarchy to Managing Editor Rick Stengel ("Stengel").   After Elliott's departure, Plaintiff reported to TIME's new International Editor, Jim Frederick ("Frederick"), who was also based in New York.

19.   Beginning in 2010, Plaintiff took on much of the role of Europe Editor after the departure of the incumbent to the position.

20.   In 2010, Plaintiff, with the full backing of TIME, took a three-month, unpaid sabbatical to work on writing her book *Amortality*, during which she maintained close contact with TIME and accepted assignments when needed.

21.   For example, at TIME's request, Plaintiff broke her sabbatical for a few weeks to write a profile on Prime Minister David Cameron before his first trip to the United States as British premier.   Cameron's team had reached out to Plaintiff personally because they were impressed by her prior TIME pieces and her reputation among British political correspondents.

22.   In fall 2011, Plaintiff was formally offered the position of Europe Editor, the top editorial job in the European region, for which she was well qualified.   The Asia Editor plays a comparable role for the Asian region and at that time was a man, Zoher Abdoolcarim ("Abdoolcarim").

23.   During negotiations for the Europe Editor position, which extended into 2012, TIME's Managing Editor, Stengel, repeatedly told Plaintiff that, "TIME cannot afford to lose your distinctive voice," such that he asked her to continue writing pieces as well as taking on the extensive duties of the Europe Editor.   In effect, TIME wanted Plaintiff to concurrently serve as both Europe Editor and a senior writer.

24.   To make it possible for Plaintiff to hold these dual responsibilities, and to induce her to accept the role despite the onerous expectations attached, TIME promised and represented

to Plaintiff that she would be able to recruit two Senior Editors to support her in her new and expanded Europe Editor role; one would line-edit magazine pieces and another would edit TIME.com stories.  TIME assured Plaintiff that she would have the budget to make these hires.  In reliance on this promise, Plaintiff accepted the position and relinquished her former role of London Bureau Chief.

25.     Plaintiff's well-deserved promotion was announced in a February 2012 e-mail to "All TIME Edit Staff" from Stengel in which he lauded her ability to "effortlessly glid[e] between different cultures," and stated:

> Catherine has been at the heart of TIME's Europe, Middle East, and Africa coverage since she joined as a Senior Editor in 2004 and became London Bureau Chief in 2006.  In her new role, Catherine will work with Jim [Frederick] and Zoher Abdoolcarim, TIME's Asia Editor, to keep our international editions at the forefront of global news business.  She will help TIME expand, deepen and enrich our international coverage on all platforms and work closely with our business side to seek out new opportunities for growth.
>
> Anyone who has read Catherine's profiles of Angela Merkel, Kate Middleton, David Cameron and Tilda Swinton, among others, is keenly aware that she possesses a distinctive voice, one I did not want to lose, so I am happy that she will also continue to write on British politics, society and culture as well as broader takes on the European Zeitgeist as often as her new duties will allow.

### *Plaintiff Begins Role as Europe Editor*

26.     Plaintiff continued her record of hard work and success in her role as Europe Editor, and she continued to be tasked with important responsibilities and to receive internal and external accolades.   For example, Plaintiff, at the request of Frederick, headed TIME International's Olympic coverage in 2012; and in January 2013, Plaintiff was honored by an external organization as one of Britain's 50 most influential women.

27.     As Europe Editor, Plaintiff managed all TMEL staff and budgets, oversaw TMEL editions of the magazine, commissioned and frequently edited pieces, continued to serve as the key public face of TIME for its Europe, Middle East, and Africa coverage, and worked with the business side of TIME to support advertising and revenues.  To make her job more manageable, Plaintiff secured permission from Frederick to hire a new Editorial Assistant, Kharunya Paramaguru ("Paramaguru"), in May 2012, whose job description he also approved.

28.     Plaintiff also turned to filling the two Senior Editor positions she had been promised.  First, she sought to recruit someone to the role of Senior Editor for Time.com.  After sorting through over 700 applications and conducting multiple interviews and office visits with potential candidates, Plaintiff narrowed the search to four.  Each of the candidates had excellent qualifications and appropriate experience.  All four candidates happened to be female.

### TIME Breaches its Representation that Plaintiff Could Hire
### Two Supporting Senior Editors

29.     Once TIME learned that all four candidates were female, it told Plaintiff without any further explanation that the budget for the promised position was frozen.

30.     The second Senior Editor position, on the magazine side, remained open.  However, in breach of its representation, Plaintiff was not given the opportunity to recruit for this position and personally vet the candidates.  Instead, Frederick told her he had just the man for the job, Matt McAllester ("McAllester"), a freelance editor from New York who had a successful career as a foreign correspondent for *Newsday* and other publications, whom Frederick and Bobby Ghosh, at the time the Deputy International Editor, knew well.

31.     McAllester was then 42 years old, ten years younger than Plaintiff.  He is highly ambitious and after climbing the ladder at TIME, departed in 2015 to become Europe Editor of Newsweek, where he is now Global Editor in Chief.

32. While McAllester was a highly competent journalist, he was selected by Frederick and Ghosh because of their personal sense of affinity and friendship with him, not through an open selection process. McAllester, Frederick, and Ghosh all shared certain characteristics. They were all men who had been war correspondents, a credential predominantly held at TIME by men. They developed a work alliance based on their shared backgrounds, interests and preferences which were in turn informed by their shared gender. The gender-based alliance worked to exclude Plaintiff and other female employees and recruits.

33. Initially, Plaintiff trusted the decision of Frederick and Ghosh, though she was surprised that TIME was allowing a non-competitive appointment to this key role. She expected that, although TIME had breached its promise of allowing her to recruit her own supporting Senior Editors, and had also breached its promise by cutting one of the positions entirely, their choice would nevertheless produce a Senior Editor who would provide appropriate support so she could excel in her new expanded position that combined both editing and writing, just as she had excelled in all of her past positions.

34. Plaintiff was invited to speak with McAllester over Skype before he arrived in London which she did, but the hiring decision had already been made without her input. During the Skype conversation, McAllester confirmed that he understood that he was being hired as her deputy and subordinate. He started work in London as Senior Editor in June 2012.

35. Plaintiff's hope that McAllester would support her role as Europe Editor was disappointed almost immediately. In his role as Senior Editor, McAllester created staff tensions and unhappiness that had not existed prior to his arrival, such that far from relieving Plaintiff of some of her job burdens, he added to them. This was not the result of a tough but fair work regime, but from bullying some subordinates and favoring others. "Non-macho" men and

women who did not conform to traditional expectations of gender roles did not fare well. He was unduly harsh with one female writer, unduly flirtatious with another. His attacks on one valuable male employee were so persistent and disturbing to him that the employee feared working with McAllester alone in the office at night. The employee soon resigned without having another job to go to because he could not stand to remain.

36.     McAllester was also overtly and brazenly contemptuous of Plaintiff, even though she was his manager. He publicly criticized her for not staying late on Tuesday and Wednesday for print deadlines, even though it had been agreed that this would be his responsibility; part of his job was to relieve her of some editorial tasks to give her time to produce hard-hitting stories, but he did not like it that she had this prerogative. McAllester openly disrespected Plaintiff at meetings through his tone, body language and by rolling his eyes when she spoke. Staff noticed immediately. He also disrespected her by often bypassing her and discussing editorial and staffing decisions directly with Frederick in New York, even though he knew that he should be clearing things with her.

37.     The cumulative effect of McAllester's presence was turmoil and unhappiness in the office, which Plaintiff raised with Frederick, her boss in New York, in July 2012. He responded simply, "You are two of my favorite people and I'm sure you will find a way to work things out." In saying this, Frederick failed to provide support for Plaintiff when she made a legitimate complaint.

### McAllester Seeks to Take over Plaintiff's Role

38.     In fact, staff in London quickly concluded that McAllester was trying to oust Plaintiff. They noticed that he was riveted on pursuing what he thought would please management in New York to an unusual degree, ordering all-out efforts to perform tasks that he

thought would make him look good even though they interfered with actual and time-sensitive work.

39.     In July 2012, McAllester's attempts to take over Plaintiff's role became more overt.  He approached a staff writer, William Lee Adams ("Adams"), and asked him to go for a walk, during which McAllester used leading questions to try to elicit complaints and "dirt" from Adams about Plaintiff, and encouraged Adams to feed him with complaints about her in the future.  He also told Adams outright that he could not bear Plaintiff, even though he knew that saying this to a subordinate would undermine the authority of Plaintiff, the person he had been hired to support.

40.     Despite being put on notice of this conduct, TIME did nothing to restrain it.

### TIME Punishes Plaintiff for No Reason

41.     In September 2012, Frederick told Plaintiff that McAllester had made three complaints about her: (1) that she was a "diva" because she sometimes consulted her cell phone during editorial meetings; (2) that she sometimes asked for administrative and research support, like help making complex travel arrangements when she was under deadline pressure; and (3) that she had not given him enough responsibility.  These allegations were each untrue or grossly exaggerated, and also unfair and discriminatory.  Calling a woman a "diva" is on its face loaded and sexist, a common way of reducing women who assert themselves.  Asserting that an overworked top editor may not use administrative staff to make travel arrangements was ridiculous on its face; indeed making use of administrative staff for this purpose was the norm at TIME, and like the "diva" slur, seemed to reflect McAllester's unwillingness to accept that a woman outranked and had authority over him.  But unlike the complaints made by Plaintiff about McAllester, Frederick took McAllester's complaints seriously enough to relay them to her, and

also to suggest that she (but not McAllester) undergo training with Sally Baxter ("Baxter"), an Executive Coach at The Pegasus Partnership Ltd.  Plaintiff was happy to accept additional training from a management expert, but was concerned about the implicit message it sent to McAllester and senior managers in New York.  McAllester had put in baseless complaints about her, yet it was she, not he, who was being asked to undergo additional training.

42.     Plaintiff first met with Baxter on September 12, 2012.

43.     During a subsequent call with Plaintiff, Frederick and Baxter on September 28, 2012, Frederick acknowledged that McAllester contributed to tensions in the office.  He also recognized as "categorically untrue" McAllester's assertion that Plaintiff was out of line to ask for administrative help from Paramaguru, the editorial assistant she had hired with a job description specifically including this kind of help, which was commonplace for editors in New York.

44.     Even McAllester subsequently retracted that complaint against Plaintiff, sending her a note of apology.  "This is my bad and I'm sorry … It is, of course, part of a junior staff member's job to help out senior writers and editors when needed.  I'm also sorry for not being open to chatting about it today – there's no excuse for rudeness or bull-headedness."

45.     Despite this, neither Frederick nor any other upper-level management reprimanded or criticized McAllester for having launched a baseless attack on Plaintiff.  Instead, Frederick deemed the complaint a simple "misunderstanding."

46.     Another time, McAllester undermined Plaintiff's work and authority by directing Paramaguru, Plaintiff's Editorial Assistant, to leave work early after Plaintiff had specifically requested her to complete an urgent project.  McAllester did this knowing that Plaintiff had made

this request, and that her assistant's failure to complete it might well make Plaintiff miss her own deadline and embarrass her in front of her bosses.

47.     Plaintiff's coaching with Baxter continued until February 2013.   Baxter, an independent leadership coach, concluded that Plaintiff was "a conscientious leader, committed to resolving tensions and determined to improve her leadership and relationships with all team members reporting to her."   She also suggested that feedback from McAllester "be given to [Plaintiff] frequently and directly and not back-channeled to [Frederick] by [McAllester] . . . giving [Plaintiff] the opportunity to respond and manage any given situation."

### Discrimination Increases When Ghosh is Promoted

48.     In early 2013, Frederick left TIME and Ghosh was promoted to International Editor.  Ghosh's support for McAllester was unwavering.

49.     Ghosh reorganized the structure of TMEL and in doing so divided Plaintiff's tasks equally between Plaintiff and her subordinate McAllester as though the two were co-Europe Editors or joint Senior Editors, without any prior discussion with the Plaintiff.  This move was coupled with an implicit grant of wide-ranging authority over TMEL's operations to McAllester. For example, he was permitted to take key decisions about TMEL without consulting Plaintiff.

50.     Ghosh's actions effectively stripped Plaintiff of responsibilities, removed her authority over McAllester and *de facto* promoted McAllester to Plaintiff's role without providing her with any reason for doing so.  Plaintiff complained to Ghosh about this, but he did not engage with her concerns.

51.     In addition to stripping Plaintiff of the authority she had earned and which came with her role as Europe Editor, Ghosh and others in New York began to obstruct Plaintiff's

writing career.  They baselessly killed ideas from Plaintiff and edited her work to such an extent that its substance and fundamental nature were changed and her brand as a writer was damaged.

52.     One idea that was 'killed' was Plaintiff's cover-length article that had been commissioned by Frederick before his departure, entitled "What If Women Ran the World." Plaintiff had already travelled to Germany, interviewed a government minister and many other senior professionals for the story.  Despite this, Plaintiff was told in 2013 that TIME was not interested in any stories about female success or similar analyses.

53.     Plaintiff was also cut down when she suggested an article on the impact of Angela Merkel's two terms as Germany's chancellor on German women, on the grounds that "stories about women aren't interesting to the wider TIME readership."

54.     In 2013, New York editors also began to deprive Plaintiff of her editorial duties, for example, by stopping her from editing a cover story she had suggested, which is very unusual, under the pretext of freeing her up for other work.

55.     On May 14, 2013, TIME's efforts to sideline Plaintiff became more visible when Nancy Gibbs ("Gibbs"), who was about to be officially promoted from Deputy to full Managing Editor, sent an e-mail to all editorial staff entitled "Air traffic control," that effectively airbrushed Plaintiff out of her job.  The e-mail removed Plaintiff's editorial and managerial powers by identifying to all writers and editorial staff around TIME that McAllester was the go-to editor for all TMEL writers.  Meanwhile, Plaintiff was not listed as an editor at all, but rather simply as a writer who was to submit articles to Ghosh.  The "Air traffic control" e-mail was sent without consulting or even warning Plaintiff, and without justification.  She was shocked when she opened the unexpected message in her inbox.

56.     At the time she was being stripped of her authority by the back door, Plaintiff was simultaneously enjoying recognition and acclaim by others for her work within TIME.  Just days before the e-mail, Plaintiff had flown to the United States with British Prime Minister David Cameron on a private jet, and was the only journalist on the trip who had secured a full sit-down interview with him. On little sleep, with a migraine prompted by TIME's mounting attacks against her, Plaintiff still managed to prepare a profile on Cameron immediately upon returning to London.

57.     She submitted the draft to Ghosh, who instead of respecting her judgment about an important story on her own, "patch" editing it lightly (as was normal with other editors), edited the piece to the point of damaging it.  It was riddled with errors and different in kind from Plaintiff's original piece.

58.     Plaintiff worked diligently to fix errors and more closely align the story with Ghosh's comments.  His second round of editing reintroduced numerous errors and further heavy changes of substance and tone.  The piece was so distorted that Plaintiff requested that her name be removed from it, signalling extremely serious disagreement.  However, Ghosh told her he had already sent the cover to print which included her byline.

59.     Since it was too late to remove her name, Plaintiff did her best to fix Ghosh's new edits but the piece was printed and as she had expected, it subjected her to heavy criticism.

### *Plaintiff is Demoted in Favor of a Younger Man*

60.     On May 28, 2013, Ghosh told Plaintiff that he had decided to give McAllester all of Plaintiff's editing and commissioning powers, and that he also wanted her to give up the title of Europe Editor and choose another title for herself, commensurate with a new role that he said TIME envisioned for her.  He explained that senior management in New York was reorganizing

the global structure of TIME and that the title of Europe Editor would now be obsolete. Although McAllester was to acquire her commissioning and editing duties, this was not a promotion of McAllester into the role of Europe Editor, he said, just a re-distribution of work, and indeed the role of regional editor was being eliminated.

61.     Ghosh told Plaintiff that part of the impetus behind the reorganization was to build up the reputations and brands of TIME's finest writers, nicknamed the "Jedi Knights," which was expected to boost TIME's reputation too.  She would be among this elite band who would be supported and promoted.  Plaintiff's extensive contacts around the world were also acknowledged, in that Ghosh also asked her to run TIME's "experiential program" of big conferences in the UK.  Ghosh emphasized that this reorganization would allow TIME to promote her unique voice as a writer, and that she should consider her new role a promotion.

62.     Nevertheless, Plaintiff knew that removing her commissioning and editing rights, as well as her title, would be understood by all within the industry to be a demotion.  She also noted that despite the supposedly global reorganization that was leading to the disappearance of the Europe Editor title, her male comparator in Asia, Abdoolcarim, was going to remain Asia Editor.  The reorganization looked like a thinly veiled attempt to sideline her.

63.     Since the reasons given to her for changing her role did not hold together, Plaintiff objected to Ghosh directly, and to the International Publisher, Andy Bush, and Ellen Shultz ("Shultz"), the head of TIME's Human Resources department in New York.  She called Shultz to complain on June 20, 2013.  But Shultz did not advise Plaintiff of her equal opportunity rights or take any action to protect her from the blatant discrimination.  Ghosh simply insisted again that Plaintiff trust his representations that moving her to focus more on writing was a promotion and that TIME would feature and support her as one of its star writers.  He suggested

that Plaintiff take on a new title such as "Editor-at-Large" or "Chief European Correspondent" to reflect her new "Jedi Knight" role.  Ghosh cited examples of others who he alleged would be giving up their titles to assume the "Editor-at-Large" title.  They were all women.  When Plaintiff asked whether her male counterpart, Abdoolcarim, the Asia Editor, would have to change his title or role, Ghosh said he would not.

64.     Ghosh's suggestion of a change in title escalated into a demand, and he pushed Plaintiff until she complied.  On Friday, August 2, 2013, he called her, just days after a personal bomb threat she received over Twitter had severely disrupted her life, which Ghosh knew about. Nevertheless he demanded that she choose between the title of Editor-at-Large or Chief European Correspondent over the weekend.

65.     Left with no good choice, Plaintiff picked the new title of Editor-at-Large, but under protest, which she made clear in e-mails to HR, Ghosh and Gibbs.

66.     Plaintiff justifiably relied upon Ghosh's assurances that the title change was not a demotion and TIME would devote resources to promoting her as a writer.

67.     Discussions over the precise elements of Plaintiff's new role lasted through August and well into September 2013.  She sought a job description, but ultimately received only a perfunctory list of tasks, which omitted any mention of whether she retained any editorial decision making authority or where she now sat in the corporate hierarchy.

68.     In breach of the representations made to her by TIME, Plaintiff's "promotion" as one of TIME's elite writers never materialized.  She was not given any special prominence on TIME's website or resources to advance her writing or brand.

### At Same Time Plaintiff is Forced into De Facto Demotion, Younger Men Are Promoted in Europe

69.     On September 5, 2013, having forced Plaintiff to relinquish her job as Europe Editor, Ghosh e-mailed Plaintiff to confirm that, despite his earlier statements to the contrary, McAllester was to be formally promoted to Europe Editor.  Plaintiff told Ghosh that his decision to promote McAllester over her was "hugely humiliating" particularly in "the context of a very difficult history with [him]."

70.     At about the same time as McAllester's promotion, Simon Shuster ("Shuster"), another male of about McAllester's age and younger than Plaintiff, was appointed by TIME and Ghosh to a different senior role in Europe, as TIME's Berlin Bureau Chief.  Plaintiff had close connections with Germany; she worked for the German magazine *Focus* for eleven years prior to joining TIME, speaks and writes fluent German, and continued to cover the country extensively while at TIME.  This change effectively cut off one of Plaintiff's major sources of stories to give them to a younger male, and contradicted TIME's promise in inducing her to become Editor-at-Large that it would enhance her opportunities as a writer.  In fact TIME was diminishing them.

### Harsh Treatment of Plaintiff Continues

71.     McAllester's promotion to Europe Editor emboldened him, and he used his position of authority to regularly reprimand Plaintiff, revive the complaints about her use of administrative support that he had apologized for in 2012, and to remove her support resources.

72.     Ghosh, in breach of his promises, did not support Plaintiff's writing.  Instead, he continually rejected her ideas without giving her positive guidance as to the types of stories he wanted.

73.     Plaintiff had worked on a substantial piece on Prince Charles in consultation with Elliott and Frederick, who had both been enthusiastic.  However, after it was well developed,

Ghosh dismissed it and wanted to downgrade it to a few pages. Plaintiff nevertheless completed a draft and shared it with Executive Editor Radhika Jones ("Jones"), who was soon promoted to Deputy Managing Editor. Jones agreed with Plaintiff that the story should run as a cover in Europe and went a step further, pressing New York and Gibbs to make it a cover in the domestic and Asia editions as well, which occurred. In fact, the issue sold well across all regions and received excellent press attention for TIME, as well as a December 2013 book offer from Random House to for a full biography on Prince Charles, which Plaintiff, in consultation with TIME, accepted. It required an unpaid sabbatical, but the book was well received when published and enhanced TIME's brand by association with Plaintiff.

74. Plaintiff continued to provide valuable work that enhanced TIME's reputation throughout 2014. Among other achievements, she co-wrote a cover story on Francois Hollande, used her excellent contacts to arrange a cover story about the band U2 that required significant travel, and at TIME's request, conducted on-stage interviews at the June 2014 Fortune Most Powerful Women summit in London.

75. Indeed, throughout her employment at TIME, Plaintiff received only excellent employee reviews. Her superiors regularly praised her work.

### *McAllester Harasses Plaintiff*

76. In June 2014, while Plaintiff was still on her book sabbatical, Ghosh left TIME for another position. This left Plaintiff with no direct manager. When she returned to work in August 2014, she received an e-mail from Gibbs, the Managing Editor telling her that McAllester would be her direct manager. Gibbs was aware of the history between McAllester and Plaintiff, and so should have appreciated the inappropriateness of putting him in direct

authority over his former boss whom he had systematically undermined, denounced and said he could not bear.  Making Plaintiff report to him was bound to cause her humiliation and injury.

77.     Plaintiff replied to Gibbs the same day explaining why this was a bad idea and suggesting a work-around: that she report directly to editors in New York, as she had always done.  She received no response.

78.     On November 5, 2014, Plaintiff contacted Reema Sharma of HR, noting that Gibbs had not responded to her email of August 17 and asking for help in resolving her unclear reporting lines.  Two weeks later, Gibbs finally advised Plaintiff, on November 20, 2014, to report to Deputy Managing Editor Michael Duffy ("Duffy") in New York.

79.     During the more than three months of uncertainty about whom to report to, McAllester acted as Plaintiff's *de facto* line manager and subjected her to further harassment, including:

(a)     demanding to know where Plaintiff was 24/7;

(b)     requiring her to produce a story for Time.com every day with no regard for her other commitments, on topics that were often far from her areas of expertise;

(c)     humiliating Plaintiff through verbal attacks, requiring her to perform unreasonably taxing work, giving her contradictory orders that regularly upended her work plans and embarrassed her in front of sources, and regularly casting her in a negative light by implicitly contrasting her with Shuster as a model performer.

80.     Even after Duffy was technically assigned to be Plaintiff's manager in November 2014, McAllester told her to continue giving her pitches to him so he could funnel them to New

York.  In fact, Plaintiff had no substantive professional contact with Duffy before she was terminated in April 2015.  He did not assign her any projects, comment on her work, or update her on business operations.  She saw him only once, by chance, in the London office.

### TIME Undermines Plaintiff's Performance and Reputation

81.    TIME undermined Plaintiff's performance and industry reputation in multiple ways including: placing extreme pressure, short notice, and unreasonable time constraints on her work; editing her pieces so as to damage and change their fundamental nature, thus prompting criticism from high-level sources and readers; exploiting Plaintiff's connections and then harming her reputation with them by making false promises about coverage; and rejecting web story and magazine story suggestions arbitrarily.

### Plaintiff Experiences Serious Health Issues as a Result of TIME's Treatment

82.    The conduct of TIME and McAllester caused Plaintiff to suffer from medical issues including extreme stress and migraines so severe that they caused her to dry-heave.  She reported these medical issues and TIME's role in their cause to McAllester as well as to HR.

83.    Plaintiff consulted with her own physician on August 18, 2014 as well as visiting the occupational health advisor recommended to her by HR on September 25, 2014.

84.    Her physician at the National Migraine Center recommended that she restrict her work hours.  However, the environment was so hostile towards her that she reasonably feared that doing so would result in further unfavorable comparisons being drawn between her and her younger male colleagues, particularly Shuster.

85.    The occupational health advisor recommended that management work with Plaintiff to implement measures to support her, allow her to "take control over her work," and

have her manager meet with her one on one to consider these recommendations.    These
recommendations were disregarded by HR and TIME as a whole.

### TIME Ignored Plaintiff's Complaints About the Discriminatory and Hostile Work Environment

86.    Throughout her employment, from 2012 to termination, Plaintiff made numerous
complaints to her managers and/or HR about her discriminatory and unfair treatment by TIME
and/or by McAllester, including as follows:

(d)    In July 2012, Plaintiff told Frederick that McAllester was undermining her
authority, openly disrespecting her style of management and creating
tensions among the London staff.  It was ignored.

(e)    In October 2012, after McAllester made baseless complaints about Plaintiff
to Frederick, Plaintiff urged Frederick to give her support in managing
McAllester, but instead he undermined Plaintiff's position further by
requiring her to take remedial coaching.  The leadership coach, Baxter,
confirmed that McAllester was at least as responsible for tensions as
Plaintiff, but McAllester was not requested to see a coach.

(f)    Throughout the period from May to September 2013, Plaintiff made it clear
to Ghosh, Shultz (HR) and Gibbs that she felt the removal of her Europe
Editor title, which was finally given to McAllester in September 2013, was
unfair and discriminatory; along with the earlier removal and re-allocation
of her commissioning and editing responsibilities to him.

(g)    On August 17, 2014, Plaintiff complained to Gibbs that it was inappropriate
and wrong for her to have to report to McAllester, her former subordinate
who had systematically undermined her.

(h)    In August 2014, Plaintiff complained to HR about the unreasonable pressure of McAllester's line management and her resultant migraines.

(i)    Plaintiff again noted the inappropriateness of having to report to and be managed by McAllester to HR on 5 November 2014, when she requested a more appropriate line manager.

87.    By December 2014, Plaintiff concluded she was deliberately being forced out of TIME.  She had been systematically undermined since McAllester was sent to London in June 2012, although the momentum of her sidelining by management increased from May 2013, when she was replaced in her various roles by younger men with no better (or worse) experience or qualifications than she; subjected to McAllester's hostile management; and assigned a supervisor who did not communicate with her.  Now all her article proposals were being rejected without reason.  Plaintiff approached HR to express concern.  She met with Amy Threlfall ("Threlfall"), a London-based HR employee, in December 2014, and relayed this chain of events.  Threlfall did not investigate Plaintiff's complaints, advise her of her rights, or protect her from any additional adverse action.  Threlfall simply told Plaintiff that she "had nothing to worry about."

### Plaintiff Is Terminated For Discriminatory and Retaliatory Reasons on the Basis of Her Age and Gender

88.    On January 6, 2015, Threlfall called Plaintiff into a meeting where Finance Director Mike Taylor ("Taylor") was also present and informed her she was at risk of termination.

89.    During subsequent meetings with Threlfall and Taylor, Plaintiff was given an end date of April 9, 2015.  Plaintiff was advised that her termination was due to a reduction in the work force that made her position redundant, and had nothing to do with her own performance.  Specifically, she was told that there was now less interest in European coverage at TIME or for

the articles she could provide on British or Western European politics and society, and that the growth area was rapid news pieces for Time.com.  These false justifications were set out in a document entitled "Business Case for the Proposed Redundancy of Editor-at-Large Position, January 2015" and were pretextual.

90.     Europe was and remains an important component of TIME's news coverage.  In late 2013, TIME hired Shuster to head up a new Berlin bureau.  Throughout 2014, Europe was recognized by TIME as a central part of its overall news operation.  In August 2014, even McAllester recognized that the magazine was running low on European stories, and turned to Plaintiff, with her excellent connections and reputation in Europe, to come up with some ideas, tacitly recognizing her value to TIME.

91.     In October 2014, TIME hired Conal Urquhart ("Urquhart"), a personal friend of McAllester's of about his same age, to help McAllester with his workload and take on some of Plaintiff's former editorial duties, including the editing of web pieces in London.  This belied the argument that there was not sufficient work for two senior editors.  There is no reason why Plaintiff could not have been reallocated some of these editorial duties, which she had been performing the previous year, rather than hire a younger man and friend of McAllester to do the work.  Urquhart's hire was inconsistent with the claim that TIME was downsizing its European operations.  And he was appointed because he was friends with McAllester, not through an open, competitive search process.

92.     Even after Plaintiff's departure, TIME has continued to make moves towards hiring staff to take on Plaintiff's writing role.  For example, TIME reached out to see if Anoosh Chakelian, Deputy Web Editor for the *New Statesman* might be available to cover UK politics.

93.     The real reason for Plaintiff's termination had nothing to do with a business need, nor with her own performance, which she was consistently told was exemplary.  Instead it was discriminatory and/or retaliatory.  Plaintiff's duties were systematically taken away from her and given to colleagues with no more experience or qualifications than her because they were younger and male.

94.     Other women have experienced discrimination based on their gender during their employment at TIME and many more can attest to the hostile work environment and long-established culture of male cronyism at TIME.

### *Plaintiff Suffered Significant Harm Because of the Discrimination and Retaliation She Was Subjected to at TIME*

95.     Plaintiff suffered damages because of the discrimination and retaliation she endured at TIME.

96.     Among the medical issues that its wrongful conduct caused were depression, insomnia, hopelessness, despair, suicidal thoughts, and debilitating migraines.

97.     Plaintiff also suffered professional and financial injuries, including being deprived of the opportunity to excel in senior leadership; being deprived of the opportunity for promotion at TIME and corresponding increases in pay and authority; being deprived of opportunities to pursue career advancement outside of TIME; and harm to her reputation as a writer that hurt her professional opportunities.  Given that there were important European stories coming up at the time of Plaintiff's termination, such as the 2015 UK election and the 2016 Brexit referendum, which observers would have expected Plaintiff to cover, her sudden departure stoked rumors that TIME must have some significant reason to remove her.

98.     The timing of Plaintiff's termination was immediately after the release of her book on Prince Charles and had a negative impact on book sales and her reputation, since many

assumed that TIME had terminated her because her research for the book was defective or for other performance-related reasons. The real reason for Plaintiff's termination had nothing to do with the book or her performance, however, but was motivated by discrimination and/or retaliation by TIME.

### Employer and Integrated Enterprise

99.     At all relevant times and in all relevant employment actions, TIME, TMEL, and Time Holdings operated as a single-employer and integrated enterprise.

100.     HR policy and final employment decision-making are centralized at TIME's offices in New York.  Employment decisions for both TIME and TMEL are made by the same individuals in New York.  TIME's HR department in New York had final say over personnel decisions in the London office, including those affecting Plaintiff.

101.     The Employee Handbook for TMEL employees permits employees who desire to make a formal protected disclosure to call a US phone number or send an e-mail to a central TIME e-mail address.  Only informal complaints are handled locally.

102.     TIME maintains HR records and screens and/or tests applicants for employment at TMEL in London.

103.     TMEL and TIME share editorial, administrative, and management personnel. Editors, writers, administrative staff, and officers commonly move between TIME and TMEL.

104.     TMEL and TIME use each other's office space when working in each other's city.

105.     TIME sets quotas that included sales by TMEL.

106.     TIME determines a global strategy, which it imposes upon all of its subsidiaries, including TMEL.

107.    Almost all of the content of the European Edition of Time Magazine, for which TMEL is responsible, comes from TIME.

108.    Plaintiff was managed by staff from TIME in New York.  Plaintiff made all but one of her complaints to TIME HR and management staff in New York;

109.    The decisions to demote Plaintiff and promote McAllester were made by Frederick, Ghosh, and Gibbs, all TIME employees based in New York.

110.    The business review and corresponding report that served as part of the pretextual basis for Plaintiff's termination emanated from New York, was on TIME's letterhead, and used language that demonstrated that it treated its foreign subsidiaries as merely arms of its primary executive office in New York, not as distinct entities.

## CLAIMS FOR RELIEF

## COUNT 1
### TITLE VII – SEX DISCRIMINATION

111.    Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 14 through 110.

112.    Plaintiff was well qualified for each role that she held at TIME and all responsibilities that she was tasked with, including her role as Europe Editor with concurrent senior writer responsibilities, and then as Editor-at-Large.  She performed well in each of these roles.  Each performance review that Plaintiff received was good or excellent, and until Plaintiff challenged the lawfulness of her dismissal post-termination she was never given any indication by TIME that her performance was in any way defective.

113.    By the acts and practices described above and herein, TIME unlawfully discriminated against Plaintiff, a female employee, in the terms and conditions of her employment, on the basis of her gender.

114.    Plaintiff was treated in a disparate and discriminatory manner compared to male employees, in at least the following ways:

(a)    In 2012, Plaintiff was not permitted to recruit her own deputy senior editors, but had her budget frozen for one post after shortlisting four female candidates; and for the other, had an employee, McAllester, imposed on her by TIME, without an open recruitment process.

(b)    McAllester was a good journalist, but was selected for the role by Plaintiff's managers because he was a male former war correspondent and so one of a favored predominantly-male or male-only group at TIME.

(c)     Far from providing Plaintiff with a supportive senior editor as her deputy as agreed so that she could excel in her new role as Europe Editor with added senior writer responsibilities, TIME gave her a deputy who undermined her and looked to oust her from the start, and TIME empowered him to behave in this manner and to succeed in doing so.

(d)     TIME did nothing in July 2012 when both Plaintiff and another employee, Adams, raised concerns about McAllester's conduct.

(e)     TIME failed to discipline McAllester when he made what were acknowledged to be baseless complaints against Plaintiff, in October 2012; instead, TIME required Plaintiff to attend remedial coaching, from December 2012 to February 2013, but not McAllester.

(f)     On 14 May 2013, TIME sent a group email to all editorial and writing staff entitled "Air Traffic Control" directing all writers to pitch stories to McAllester, instead of to Plaintiff (despite her position as Europe Editor and McAllester's boss), and listed Plaintiff only as a writer.  This unexpected public demotion or dismissal from her job as Europe Editor was highly damaging to Plaintiff's reputation within the organization.  The decision was taken to promote and benefit McAllester at Plaintiff's expense because McAllester was one of a favored male group.

(g)     TIME confirmed this decision in May 2013, when it told Plaintiff that it wanted her to relinquish her editorial and commissioning duties to McAllester, even though her performance in role was never criticized, and

indeed TIME acknowledged that it had nothing to do with poor performance on her part.

(h)    In June 2013, Plaintiff complained about her unfair and disparate treatment to HR, but TIME took no action to protect her or even to investigate.

(i)    In August 2013, Plaintiff was ordered to change her title from Europe Editor to something else on the basis that TIME was now abandoning the title of Editor for its regional editions, even though her male counterpart retained his title as Asia Editor.

(j)    In September 2013, TIME formally promoted McAllester into Plaintiff's former position, and gave him the title of Europe Editor, in spite of its previous assurance to Plaintiff that she was not being removed from that job so that McAllester could take it on.  In this way, through a series of stealthy steps and outright deception, TIME succeeded in removing Plaintiff from her post, despite excellent past performance, and promoting her younger male subordinate into it.

(k)    Throughout the rest of 2013 up to her termination date in 2015, Plaintiff was made to report to and pitch her article ideas to McAllester, her former subordinate who disdained her, a humiliation not visited on any of her comparable male colleagues.  He was now only in a position of authority over her because TIME had unlawfully removed her from post to make way for him.

(l)    In late 2013, TIME decided to create a Berlin bureau and place another younger male former war correspondent, Shuster, in that post so that he

could write on German politics and society, an area in which Plaintiff had particular expertise, thus removing yet more work from her role and giving it to a younger male employee.

(m)   In October 2014, TIME recruited one of McAllester's friends, Urquhart, a man of similar age to McAllester and younger than Plaintiff, to take over some of Plaintiff's former editorial duties that TIME had told her were no longer necessary, instead of returning them to her.

(n)   In January 2015, TIME put Plaintiff on notice that it was considering dismissing her, in response to an alleged need to reduce the workforce.  It did not even consider dismissing either of the two men in London, McAllester or Urquhart, who had less experience than her, were less versatile as writers and editors, and had been hired more recently.

(o)   TIME's dismissal of Plaintiff.

115.   As a result of Defendant's discriminatory actions, Plaintiff has and/or will continue to suffer irreparable injury including: losses in past and future compensation and earning capacity, humiliation, mental anguish, migraines, emotional distress and damage to reputation. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

116.   Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

117.   Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT 2
### TITLE VII - HOSTILE WORK ENVIRONMENT
### ON THE BASIS OF GENDER

118.  Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 14 through 110.

119.  By the acts and practices described above, Plaintiff was subjected to a hostile work environment on the basis of her gender.  Plaintiff was subjected to severe and pervasive acts of unwelcome and/or offensive conduct on the basis of her gender, which have created a hostile work environment.  In addition, the cumulative effect of the acts of discrimination also created a hostile work environment for Plaintiff.

120.  The hostile, offensive, and discriminatory treatment that Plaintiff was subjected to by TIME included, without limitation:

    (a)    all the actions taken by McAllester to undermine Plaintiff's authority as Europe Editor in 2012 and early 2013, which produced turmoil in the office and made Plaintiff's management duties more complex, including:

        (i)    in July 2012, when McAllester tried to persuade junior staff to provide him with negative comments about Plaintiff, which he could to persuade managers in New York that he should replace her;

        (ii)    in July 2012, when McAllester told a junior member of staff that he "can't bear" Plaintiff;

        (iii)    from June 2012 to the date of Plaintiff's termination in 2015, each and every time McAllester rolled his eyes, sighed, or used other forms of body language to denote irritation and disrespect towards Plaintiff;

(iv)   each and every time McAllester as Plaintiff's deputy bypassed Plaintiff – his boss – and took editorial or management questions directly to editors in New York without consulting her;

(v)   in 2012, McAllester's overbearing and discriminatory treatment of junior staff which he hid from Plaintiff in order to create unease and distrust of her among them;

(vi)   in 2012, each and every time McAllester made a disparaging remark about Plaintiff to her or to junior or senior employees, including complaining about her time-keeping; her absence from the office on print deadline nights; her use of her mobile phone; and her general demeanor or personal qualities;

(vii)   in September 2012, when McAllester made a knowingly baseless and sexist complaint about Plaintiff to Frederick;

(viii)   in 2012-13, when McAllester encouraged junior staff (including Paramaguru, the assistant Plaintiff hired to provide administrative support) to ignore Plaintiff's instructions, even when this threatened Plaintiff's ability to meet TIME filing deadlines.

(b)   all the individual events from the "Air Traffic Control" email on May 14, 2013 to the appointment of McAllester into Plaintiff's position in September 2013, by which TIME removed Plaintiff from a position in which she was performing well to replace her with her subordinate, including the series of representations Ghosh made to persuade Plaintiff to accept TIME's actions

that were subsequently broken, all of which caused her distress and humiliation.

(c) From 2013 to the date of her termination in 2015, the humiliation Plaintiff experienced in having to pitch article ideas to her former subordinate and answer to his pressing and unreasonable demands about her work, her time-keeping and her schedule; and hear herself unfavorably compared to younger male colleagues in comparisons that ignored her productivity and work quality.

(d) From August to November 2014, when Gibbs instructed Plaintiff to report directly to McAllester despite knowing how McAllester had undermined and replaced her; and then Gibbs ignoring Plaintiff's complaint about this management line for over three months, during which Plaintiff had to endure McAllester's bullying and harassment as her *de facto* manager.

(e) Each time Plaintiff's well-founded article ideas or pitches were routinely rejected by Ghosh or Duffy or other editors in New York despite Ghosh's earlier promise that TIME would promote Plaintiff's writing career.  This reinforced Plaintiff's view that TIME had decided to sideline her, as an older female employee, and was ready to breach promises given.

(f) Each time Plaintiff was told TIME was not interested in articles about women, since Plaintiff did not believe this to be evidence-based or true and simply demonstrated a bias that TIME did not bother to hide, and which reinforced her sense of being in a disfavored group.

(g)     Each time Ghosh or other editors in New York edited Plaintiff's articles so heavily as to change their fundamental sense, which would be attributed to her when the piece was published; and each time Ghosh simply sent heavily edited articles to press without Plaintiff's approval such that she was subjected to negative comments by important sources or others in the industry after publication.

(h)     The hiring of Urquhart, a friend of McAllester, to perform writing and editorial tasks that Plaintiff used to do and was well qualified to do, just before TIME argued that Plaintiff's role was no longer necessary and that her skills were not needed.

(i)     The opening of the Berlin bureau and installation of a younger former war correspondent as chief, which removed an important stream of Plaintiff's work and was also humiliating.

(j)     TIME's failure to honor its promise to promote her brand as a writer in 2013, when it actually did nothing to promote her, and instead undercut her efforts to produce quality pieces.

(k)     TIME's notice to Plaintiff in January 2015 that she had been selected for dismissal, when in response to an alleged need to reduce the workforce it admitted that she was the only candidate.   It did not even consider dismissing either of the two men, McAllester or Urquhart, who had less experience than her, were less versatile as writers and editors, and had been hired more recently.

(l)     Time's dismissal of Plaintiff in April 2015.

121.   The unlawful treatment of Plaintiff was motivated by her gender, and it was pervasive, occurring frequently and over a period of years.

122.   This abusive and hostile behavior and treatment of Plaintiff was objectively and subjectively hostile and abusive, such that it caused emotional distress to Plaintiff and physical injury, in the form of debilitating migraines, and interfered with her reputation and employment. No reasonable person in Plaintiff's position would be expected to tolerate the hostile conditions that she was subjected to.

123.   As a result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, physical injury, emotional distress and reputational damage. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

124.   Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

125.   Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT 3
## ADEA: AGE DISCRIMINATION

126.   Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 14 through 110.

127.   Plaintiff is, and at all relevant times was, over forty years old.

128.   Plaintiff was well qualified for each role that she held at TIME and all responsibilities that she was tasked with, including her role as Europe Editor and concurrent senior writer responsibilities.

129.     By the acts and practices described above and herein, TIME unlawfully discriminated against Plaintiff, an employee over the age of forty, in the terms and conditions of her employment, because of her age.

130.     Each of the acts of discriminatory treatment described above and listed in summary form in paragraph 120, as examples of sex discrimination, Plaintiff re-alleges here as examples also or alternatively of age discrimination.

131.     Plaintiff was treated in a disparate manner compared to male employees, was demoted from a role she was qualified for because of her age, and was ultimately unlawfully terminated from a role she was qualified for because of her age.

132.     Plaintiff was replaced, initially *de facto*, and then formally by a younger, male employee.

133.     As a result of Defendant's discriminatory actions, Plaintiff has and will continue to suffer irreparable injury: losses in past and future compensation and earning capacity; humiliation, mental anguish, and emotional distress; injury to reputation and physical injury in the form of debilitating migraines.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

134.     Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

135.     Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT 4
## ADEA - HOSTILE WORK ENVIRONMENT
## ON THE BASIS OF AGE

136.     Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 14 through 110.

137.    By the acts and practices described above and herein, Plaintiff was subjected to a hostile work environment because of her age.  Plaintiff was subjected to severe and pervasive acts of unwelcome and/or offensive conduct on the basis of her age, which have created a hostile work environment.

138.    The hostile, offensive, and discriminatory treatment, that Plaintiff was subjected to at the hands of TIME included, without limitation, all of the acts described in summary form at paragraph 120 above.  Each and every act listed as contributing to Plaintiff's hostile work environment on the basis of gender, is re-alleged here also or alternatively as an act contributing to hostile work environment on the basis of age.  The unlawful treatment of Plaintiff was because of her age, as well as gender, and was pervasive, occurring frequently and over a period of years.

139.    This abusive and hostile behavior and treatment of Plaintiff was objectively and subjectively hostile and abusive, such that it caused her emotional distress, physical injury in the form of debilitating migraines and interfered with her reputation and employment. No reasonable person in Plaintiff's position would be expected to tolerate the hostile conditions to which she was subjected.

140.    As a result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

141.    Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

142.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT 5

## RETALIATION FOR ENGAGING IN A PROTECTED ACTIVITY
## IN VIOLATION OF TITLE VII AND THE ADEA

143.    Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 14 through 110.

144.    Plaintiff engaged in protected activities, including without limitation, all the complaints Plaintiff made to TIME listed at paragraphs 86 and 87 above.

145.    TIME retaliated against Plaintiff for engaging in the protected activities by continuing to unlawfully discriminate against her, continuing to subject her to unwelcome hostile treatment on the basis of her age and sex, and ultimately, terminating Plaintiff for unlawful and discriminatory reasons on April 9, 2015.

146.    As a result of Defendant's discriminatory actions, Plaintiff has and will continue to suffer irreparable injury, losses in past and future compensation and earning capacity; humiliation, mental anguish, physical injury in the form of debilitating headaches and emotional distress and injury to reputation.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

147.    Plaintiff requests relief as described in the Prayer for Relief below.


## COUNT 6
## FRAUDULENT MISREPRESENTATION UNDER NEW YORK LAW

148.    Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 14 through 110.

149.    TIME fraudulently induced Plaintiff to take on additional responsibilities, remain employed with TIME, and forgo other employment opportunities by knowingly omitting

material facts, and making material misrepresentations of present fact that TIME knew to be untrue at the time they were made.

150.    The misrepresentations and omissions made by TIME took place over a number of years and included, without limitation:

(a)    statements that Plaintiff would be provided and allowed to select supportive senior editors if she accepted the Europe Editor role in 2012;

(b)    affirmations that McAllester was not and would not become Plaintiff's supervisor or manager, including that he would not be appointed to the Europe Editor role once she relinquished that title;

(c)    failing to inform Plaintiff that McAllester had become her supervisor or manager;

(d)    promising Plaintiff in unequivocal terms that if she renounced the title of Europe Editor and took on the role of Editor at Large, TIME would treat this as a promotion;

(e)    promising Plaintiff that TIME would devote resources and publicity to promoting her as a "Jedi Knight" writer in return for renouncing her position as Europe Editor; and

(f)    multiple affirmations that Plaintiff was not and would not be demoted.

151.    TIME omitted the material facts and made the material misrepresentations to Plaintiff with a preconceived and undisclosed intent not to fulfill them.

152.    TIME made material misrepresentations and omitted material facts to Plaintiff to induce Plaintiff's reliance to remain available to it to her detriment.

153.    Plaintiff reasonably and detrimentally relied on each of TIME's misrepresentations and omissions.

154.    As a direct and proximate cause of the fraudulent representations and material omissions, Plaintiff suffered damages, including, but not limited to, compensatory damages, damage to her professional reputation, lost wages, benefits and other financial losses, and emotional distress.

155.    TIME's omissions and express misrepresentations constitute gross, wanton, and/or willful fraud.

156.    Plaintiff requests relief as described in the Prayer for Relief below.

## **DEMAND FOR JURY TRIAL**

157.    Plaintiff respectfully demands a trial by jury as to all matters so triable pursuant to Fed. R. Civ. Pro. 38.

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff respectfully demands judgment against Defendant TIME awarding:

(a)    Damages in amounts to be established at trial, including without limitation, damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish and physical injury in the form of debilitating migraines, compensation for harm to reputation, loss of past, present and future enjoyment of life, and past and future lost earnings and earning capacity;

(b)    Punitive damages;

(c)    Costs and expenses;

(d)    Attorneys' fees pursuant to 42 U.S.C. § 2000e and 29 U.S.C. § 216(b);

(e)    Pre- and post-judgment interest; and

(f)    Such other and further relief as the Court may deem just and proper.


Dated: July 24, 2017.

Respectfully submitted,


BY:    s/ Frederic C. Weiss

Frederic C. Weiss
(FCW-0010)
124 East 55th Street, 4th Floor
New York, New York 10022.
Telephone: (212) 223-0555
Facsimile: (212) 223-8338
Email: fredweisslaw@gmail.com


BY:    s/ Ann McAllister Olivarius

Ann McAllister Olivarius
*(Application to SDNY pending)*
NY Bar License 4608972
McALLISTER OLIVARIUS
7 Wells Street
Saratoga Springs, New York 12866
Telephone: (518) 633-4775
Facsimile: (781) 658-2480
Email: aolivarius@mcolaw.com

*Counsel for Plaintiff*