## UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF NEW YORK

| | | |
|---|---|---|
| CATHERINE MAYER, | ) | Case No.: 1:17-cv-05613 |
| | ) | |
| Plaintiff, | ) | **JURY TRIAL DEMANDED** |
| | ) | |
| | ) | |
| v. | ) | |
| | ) | |
| | ) | |
| TIME INC. | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## PLAINTIFF'S COMPLAINT AND DEMAND FOR JURY TRIAL

Plaintiff CATHERINE MAYER ("Plaintiff"), by and through her undersigned attorneys, complains of Defendant TIME INC. ("TIME New York") and in support respectfully alleges, upon information and belief, the following:

## NATURE OF THE ACTION

1.      This action is brought for discrimination and retaliation in employment pursuant to Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e, *et. seq.* ("Title VII") and the Age Discrimination in Employment Act of 1967, 29 U.S.C. § 621, *et. seq.* ("ADEA").  TIME New York has violated these laws by operating a system of male cronyism, in which men, especially former war correspondents, were impermissibly favored over women in recruitment, dismissal and promotion decisions.  Plaintiff, a woman now 56, was personally damaged by this

discriminatory practice.  In addition, Plaintiff brings a state law claim for misrepresentation on the basis of breached promises and representations made by TIME New York to induce Plaintiff to accept certain employment decisions, and to cover up the discriminatory nature of these decisions.

2.       Plaintiff also seeks costs and attorneys' fees authorized by Title VII and the ADEA.

## PARTIES

3.       Plaintiff is a dual national, holding citizenship of both the United States and the United Kingdom.  She was born in the United States but currently resides in London, United Kingdom.  During the relevant period, and at all material times, Plaintiff was employed by TIME New York jointly with and/or through its wholly-owned and controlled subsidiaries Time Magazines Europe Limited ("TMEL") and TIME Atlantic Europe Holdings Limited ("Time Holdings").

4.       TIME New York is a domestic corporation, duly organized and existing under the laws of Delaware, with its principal place of business located at 225 Liberty Street, New York, New York 10281.

5.       TIME New York is an employer in an industry that affects commerce and employs 20 or more employees, qualifying as an employer for the purposes of Title VII under 42 U.S.C. § 2000e(b) and of the ADEA under 29 U.S.C. § 630(b).

6.       TIME New York is the parent corporation of about forty-six subsidiaries operating in four countries including TMEL and Time Holdings.

7.      Time Holdings is a wholly owned subsidiary of TIME New York.  TMEL is in turn a wholly owned subsidiary of Time Holdings.  TMEL and Time Holdings both have their registered address in the United Kingdom, at 3rd Floor, 161 Marsh Wall, London, E14 9AP.

8.      At all relevant times TIME New York, TMEL, and Time Holdings operated as a single-employer and integrated enterprise.  Whenever and wherever reference is made in this Complaint to any act by TIME New York, TMEL or Time Holdings, sometimes collectively referred to here as "TIME," such allegations and reference shall also be deemed to mean the acts and failures to act of TIME New York acting individually, jointly, and/or severally.

## JURISDICTION AND VENUE

9.      This Court has jurisdiction over Plaintiff's claims pursuant to 28 U.S.C. § 1331, the ADEA, and Title VII.

10.      Venue is proper in the Southern District of New York pursuant to 28 U.S.C. § 1391 because, *inter alia*, TIME New York has its headquarters in this District and a substantial part of the unlawful employment practices alleged below occurred in this District.

## ADMINISTRATIVE PROCEDURES

11.      On July 15, 2015, Plaintiff filed a timely Intake Questionnaire alleging employment discrimination and retaliation with the Equal Employment Opportunity Commission ("EEOC") in its New York District Office.  Plaintiff's Questionnaire expressed her desire to file a charge of discrimination, for the EEOC to "look into the discrimination," and for the EEOC to provide TIME New York information about the charge.  Plaintiff attached to her Questionnaire a contemporaneous statement, attesting, under penalty of perjury, to the particulars of her charge

of discrimination, and signed.  A copy of the Intake Questionnaire is attached hereto as Exhibit A.

12.    On August 19, 2015, Plaintiff filed a duly notarized charge of employment discrimination and retaliation with the EEOC, containing statements and information identical to that in the July 15 Intake Questionnaire.  A copy of the notarized charge is attached hereto as Exhibit B.

13.    On September 1, 2015, the EEOC provided TIME New York a Notice of Charge of Discrimination and directed it to provide a timely statement of its position.  In response, on October 30, 2015, TIME New York filed with the EEOC its response to the merits of Plaintiff's charge, a copy of which was provided to Plaintiff on April 6, 2016, to which she filed a rebuttal with the EEOC on May 4, 2016.  Notice of a right to sue letter was issued by the EEOC to Plaintiff on April 28, 2017, and this Complaint was filed within 90 days of receipt of said notice. A copy of the right to sue letter is attached hereto as Exhibit C.

14.    All conditions precedent to the maintenance of this suit and the Plaintiff's claims have occurred, been performed or are otherwise waived.

## GENERAL ALLEGATIONS

### *Plaintiff Establishes Herself as a Highly Regarded Journalist and Editor*

15.    Prior to her employment with TIME, Plaintiff was a highly regarded journalist and editor.  She began her career at the *Economist*, served as a deputy editor of two magazines, *Business Traveller* and *International Management*, and worked for eleven years as a foreign correspondent at the German news weekly *Focus*.  During her time at *Focus*, Plaintiff proved herself adept at writing in German as well as English and deeply connected in Germany, the UK, and the United States, the country of her birth.

### *Plaintiff Is Hired by TIME New York and Makes Significant Contributions*

16.     Plaintiff began working for TIME in 2004.  She was recruited for and assigned to TIME New York's London arm, TMEL.

17.     From 2005, with the exception of a three-month period of unclear reporting lines in 2014, Plaintiff reported directly to line managers in New York during her employment with TIME.  Her work was edited in New York, and her ideas were pitched to and commissioned by those in New York, always with an eye to their relevance for the domestic edition (sold in the United States) as well as the Atlantic edition (sold in Europe, the Middle East and Africa) and other international editions.  TIME is quintessentially a United States brand, headquartered in New York, with offices elsewhere in the world.  TIME's US audience and paid circulation figures dwarf those of its European and Asian editions.  *See* https://timemediakit.com/audience; https://www.timemediakit.com/wp-content/uploads/2015/12/TIME_Publisher-Statement-1H-2015.pdf (which notes TIME's United States audience as numbering 17,400,000 in spring 2016, with an EMEA circulation of 362,000 and Asia circulation of 285,000, also in 2016).

18.     Plaintiff threw herself into her work at TIME and became a well-known and respected asset to the company.  Her industry and achievements were recognized with numerous informal commendations, consistently outstanding performance reviews, and increasing responsibility.

19.     In 2006, Plaintiff was promoted to the role of London Bureau Chief.  In this role, she continued to report directly to Michael Elliott ("Elliott"), the International Editor in New York.   Plaintiff continued to report directly to Elliott after he was elevated to take on the additional role of Deputy Managing Editor, second in the TIME hierarchy to Managing Editor

Rick Stengel ("Stengel").   After Elliott's departure, Plaintiff reported to TIME's new International Editor, Jim Frederick ("Frederick"), who was also based in New York.

20.     Beginning in 2010, Plaintiff took on much of the role of Europe Editor after the departure of the position's incumbent.

21.     In 2010, Plaintiff, with the full backing of TIME, took a three-month, unpaid sabbatical to write her book *Amortality*, during which she maintained close contact with TIME and accepted assignments as requested by TIME.

22.     For example, at TIME's request, Plaintiff broke her sabbatical for a few weeks to write a profile on Prime Minister David Cameron before his first trip to the United States as British premier.   Cameron's team had reached out to Plaintiff personally because they were impressed by her prior TIME pieces and her robust reputation among British political correspondents.

23.     In fall 2011, Plaintiff was formally offered the position of Europe Editor, the top editorial job in the European region, for which she was well qualified.   The Asia Editor plays a comparable role for the Asian region and at that time was a man, Zoher Abdoolcarim ("Abdoolcarim").

24.     During negotiations for the Europe Editor position, which extended into 2012, TIME's Managing Editor in New York, Managing Editor, Stengel, repeatedly told Plaintiff that, "TIME cannot afford to lose your distinctive voice," such that he asked her to continue writing pieces as well as taking on the extensive duties of the Europe Editor.  In effect, TIME New York wanted Plaintiff to concurrently serve as both Europe Editor and a senior writer, a job that Plaintiff only accepted because Frederick assured her that the role would be reshaped and supported to enable her to carry out both roles.   While Plaintiff was offered a pay rise to take on

this combined and reshaped role, the amount offered was not the kind of pay rise she would have demanded had TIME New York told her then that it would expect her to carry out both roles without two supportive senior editors.

25.     To enable Plaintiff to hold these dual responsibilities, and to induce her to accept the role despite the onerous expectations attached and at the pay offered, Frederick promised and represented to Plaintiff that TIME New York would allow her to recruit two Senior Editors to support her in her new and expanded Europe Editor role.  One would line-edit magazine pieces and another would edit TIME.com stories.  TIME New York assured Plaintiff that she would have the budget to make these hires.  Frederick did not tell Plaintiff that, contrary to his promises, he had already selected a war correspondent friend that he was friendly with, Matthew McAllester ("McAllester"), for the role of Senior Editor in London, and that McAllester's personal ambition combined with his expectations of favored treatment from Frederick, as a fellow former war correspondent, made him particularly ill-suited to serve as Plaintiff's subordinate and support.

26.     In reliance on Frederick's promise, Plaintiff accepted the position and relinquished her former role of London Bureau Chief.

27.     Plaintiff's well-deserved promotion was announced in a February 2012 email to "All TIME Edit Staff" from New York-based Stengel in which he lauded her ability to "effortlessly glid[e] between different cultures," and stated:

> Catherine has been at the heart of TIME's Europe, Middle East, and Africa coverage since she joined as a Senior Editor in 2004 and became London Bureau Chief in 2006.  In her new role, Catherine will work with Jim [Frederick] and Zoher Abdoolcarim, TIME's Asia Editor, to keep our international editions at the forefront of global news business.  She will help TIME expand, deepen and enrich our international coverage on all platforms and

work closely with our business side to seek out new opportunities for growth.

Anyone who has read Catherine's profiles of Angela Merkel, Kate Middleton, David Cameron and Tilda Swinton, among others, is keenly aware that she possesses a distinctive voice, one I did not want to lose, so I am happy that she will also continue to write on British politics, society and culture as well as broader takes on the European Zeitgeist as often as her new duties will allow.

### *Plaintiff Begins Role as Europe Editor*

28.    Plaintiff continued her record of hard work and success in her role as Europe Editor, and she continued to be tasked from New York with important responsibilities.  New York applauded her contribution with internal accolades that were reinforced by those who saw her work in Europe.  For example, Plaintiff, at the request of New York-based Frederick, headed TIME International's Olympic coverage in 2012; in January 2013, Plaintiff was honored by an external organization, Women in Excellence, as one of Britain's 50 most influential women.

29.    As Europe Editor, Plaintiff managed all TMEL staff and budgets, oversaw TMEL editions of the magazine, commissioned and frequently edited pieces, continued to serve as the key public face of TIME for its Europe, Middle East, and Africa coverage, and worked with the business side of TIME to support advertising and revenues.  To make her job more manageable and enhance overall operational efficiencies, Plaintiff secured permission from Frederick, in New York, to hire a new Editorial Assistant, Kharunya Paramaguru ("Paramaguru"), in May 2012, whose job description Frederick also approved.

30.    Plaintiff also turned to filling the two Senior Editor positions Frederick had promised she could fill.  First, she sought to recruit someone to the role of Senior Editor for Time.com.  After sorting through over 700 applications and conducting multiple interviews and

office visits with potential candidates, Plaintiff narrowed the search to four. Each of the candidates had excellent qualifications and appropriate experience. All happened to be female.

### TIME New York Breaches its Representation that Plaintiff Could Hire Two Supporting Senior Editors

31.    Once TIME New York learned that all four candidates were female, Plaintiff was told by Frederick, without any further explanation, that the budget for the promised position was frozen.

32.    The second Senior Editor position, on the magazine side, remained open. However, in breach of TIME New York's promise, Plaintiff was not given the opportunity to recruit for this position and personally vet the candidates. Instead, Frederick told her (from New York) that he had just the man for the job, Matt McAllester a freelance editor then in New York who had a successful career as a war correspondent for *Newsday* and other publications, whom Frederick and Bobby Ghosh, at the time the Deputy International Editor, based in New York, knew well.

33.    McAllester was then 42 years old, ten years younger than Plaintiff. On information and belief, he is highly ambitious and after climbing the ladder at TIME, departed in 2015 to become Europe Editor of Newsweek, ascending in January 2017 to Global Editor in Chief in New York before his abrupt departure from Newsweek in August 2017, shortly after the original complaint in this case was filed, when allegations were raised at Newsweek that his behavior there was disruptive and discriminatory in ways similar to his behavior at TIME, as set out in the original complaint.

34.    McAllester was selected by Frederick and Ghosh because of their personal sense of affinity and friendship with him, not through an open selection process. McAllester, Frederick, and Ghosh all shared certain characteristics. They were all men who had been war

correspondents, a credential predominantly held at TIME by men.  They developed a work alliance based on their shared backgrounds, interests and preferences which were in turn informed by their shared gender.  The gender-based alliance worked to exclude Plaintiff and other female employees and recruits.

35.     Initially, Plaintiff trusted Frederick's decision.  Frederick was a good editor and this had lulled Plaintiff into trusting his judgment generally, but she was still surprised that TIME was allowing a non-competitive appointment to this key role.  Plaintiff expected that, although TIME had breached its promise of allowing her to recruit her own supporting Senior Editors, and had also breached its promise by cutting one of the positions entirely, the choices of her superiors in New York would nevertheless produce a Senior Editor who would provide appropriate support so she could excel in her new expanded position that combined both editing and writing, just as she had excelled in all of her past positions.

36.     Plaintiff was invited to speak with McAllester over Skype before he arrived in London, which she did, but the hiring decision had already been made in New York without her input.  During the Skype conversation, McAllester confirmed that he understood that he was being hired as her deputy and subordinate.  He started work in London as Senior Editor in June 2012.

37.     Plaintiff's appropriate expectation that McAllester would support her role as Europe Editor was destroyed almost immediately upon his arrival.  In his role as Senior Editor, McAllester created staff tensions and unhappiness that had not previously existed.  Far from relieving Plaintiff of some of her job burdens, McAllester added to them.  This was not the result of a tough but fair work regime, but from bullying some subordinates and favoring others.  "Non-macho" men and women who did not conform to traditional expectations of gender roles

did not fare well.  He was unduly harsh with one female writer, unduly flirtatious with another.  His attacks on one valuable male employee were so persistent and disturbing that the employee feared working with McAllester alone in the office at night.  The employee soon resigned without having another job because he could not stand to remain.

38.     McAllester was also overtly and brazenly contemptuous of Plaintiff, even though she was his manager.  He publicly criticized her for not staying late on Tuesday and Wednesday for print deadlines, even though he had been assigned this responsibility; part of his job was to relieve her of some editorial tasks to give her time to produce hard-hitting stories.  Indeed on those evenings, Plaintiff was usually writing to deadline or on a research trip, so was not in any way neglecting her duties, as McAllester led others to believe.  McAllester knew this, and did not like it that Plaintiff had this prerogative, so he used her absence as a pretext for undermining her.  McAllester openly disrespected Plaintiff at meetings through his tone, body language and by rolling his eyes when she spoke.  Staff noticed immediately.  He also disrespected her by often bypassing her and discussing editorial and staffing decisions directly with Frederick in New York, even though he knew that he should be discussing and receiving approval for such decisions with his direct manager, Plaintiff.

39.     The cumulative effect of McAllester's presence was to spread turmoil and unhappiness in the office.  McAllester even criticized Plaintiff to her boss in New York, Frederick, having his ear because he was one of his war correspondent buddies.  When Frederick discussed this with Plaintiff, she explained to Frederick the undermining and negative nature of McAllester's presence in the office.  Far from being a support for her, he was in fact a problematic employee she was having to carefully manage.  Frederick responded simply, "You

are two of my favorite people and I'm sure you will find a way to work things out."   In saying

this, Frederick failed to provide support for Plaintiff when she made a legitimate complaint.

### *McAllester Seeks to Take over Plaintiff's Role*

40.     Staff in London quickly concluded that McAllester was trying to oust Plaintiff.

They noticed that he was unusually riveted on pursuing what he thought would please

management in New York, ordering all-out efforts to perform tasks that he thought would make

him look good even though they interfered with actual and time-sensitive work.

41.     In July 2012, McAllester's attempts to take over Plaintiff's role became more

overt.   He approached an American staff writer, William Lee Adams ("Adams"), then based in

the London office, and asked him to go for a walk, during which McAllester used leading

questions to try to elicit complaints and "dirt" from Adams about Plaintiff, and encouraged

Adams to feed him with complaints about her in the future.   He also told Adams outright that he

could not bear Plaintiff, even though he knew that saying this to a subordinate would undermine

the authority of Plaintiff, the person he had been hired to support.

42.     Despite being put on notice of this conduct by Plaintiff's report to Frederick, as

well as to Ellen Shultz ("Shultz") in TIME's Human Resources Group ("HR") in New York, and

to Reena Sharma ("Sharma") in London HR, TIME did nothing to restrain it.

### *TIME Punishes Plaintiff for No Reason*

43.     In September 2012, Frederick told Plaintiff that McAllester had made three

complaints to New York about her: (1) that she was a "diva" because she sometimes consulted

her cell phone during editorial meetings; (2) that she sometimes asked for administrative and

research support, like help making complex travel arrangements when she was under deadline

pressure; and (3) that she had not given him enough responsibility.   These allegations were each

untrue or grossly exaggerated, and also unfair and discriminatory.  Calling a woman a "diva" is on its face loaded and sexist, a common way of reducing women who assert themselves. Asserting that an overworked top editor may not use administrative staff to make travel arrangements was ridiculous on its face; making use of administrative staff for this purpose was the norm at TIME in New York for the men at Plaintiff's level and above, and, like the "diva" slur, reflected McAllester's unwillingness to accept that a woman outranked and had authority over him.  But unlike the complaints made by Plaintiff about McAllester, Frederick took McAllester's complaints seriously enough to relay them to her, and also to suggest that she (but not McAllester) undergo training with Sally Baxter ("Baxter"), an Executive Coach at The Pegasus Partnership Ltd.  Plaintiff was happy to accept additional training from a management expert, but was concerned about the implicit message it sent to McAllester and senior managers in New York.  McAllester had made baseless complaints to the New York senior executives about Plaintiff, yet it was she, not he, who was asked to undergo additional training.

44.     Plaintiff first met with Baxter on September 12, 2012.

45.     During a subsequent call with Plaintiff, Frederick and Baxter on September 28, 2012, Frederick acknowledged that McAllester contributed to tensions in the office.  He also recognized as "categorically untrue" McAllester's assertion that Plaintiff was out of line to ask for administrative help from Paramaguru, the editorial assistant she had hired with a job description specifically including this kind of help, which was commonplace for male editors in New York.

46.     Even McAllester subsequently retracted that complaint against Plaintiff, sending her a note of apology.  "This is my bad and I'm sorry …  It is, of course, part of a junior staff

member's job to help out senior writers and editors when needed.  I'm also sorry for not being open to chatting about it today – there's no excuse for rudeness or bull-headedness."

47.     Despite this, neither Frederick nor any other upper-level management in New York reprimanded or criticized McAllester for having launched a baseless attack on Plaintiff. Instead, Frederick deemed the complaint a simple "misunderstanding."

48.     Another time, McAllester undermined Plaintiff's work and authority by directing Paramaguru, Plaintiff's Editorial Assistant, to leave work early after Plaintiff had specifically requested her to complete an urgent project.  McAllester did this knowing that Plaintiff had made this request, and that her assistant's failure to complete it might well make Plaintiff miss her own deadline, a serious failing that would have cost TIME and caused Plaintiff significant adverse repercussions.

49.     Plaintiff's coaching with Baxter continued until February 2013.   Baxter, an independent leadership coach, concluded that Plaintiff was "a conscientious leader, committed to resolving tensions and determined to improve her leadership and relationships with all team members reporting to her."   She also suggested that feedback from McAllester "be given to [Plaintiff] frequently and directly and not back-channeled to [Frederick] by [McAllester] . . . giving [Plaintiff] the opportunity to respond and manage any given situation."

### Discrimination Increases When Ghosh is Promoted

50.     In early 2013, Frederick left TIME and Ghosh, who had occupied many reporting roles for TIME, most notably as Baghdad Bureau Chief and had the previous November accompanied Managing Editor Richard Stengel on a trip to Egypt, was promoted to International Editor, based in New York.  Ghosh's "appointment has absolutely nothing to do with the fact

that he saved me from getting tear-gassed in Tahrir Square last year," wrote Stengel in a memo announcing the appointment, giving due deference to his conflict zone credentials.

51.     As acknowledged by Stengel to Plaintiff in a telephone call around this time, Ghosh was a better journalist than editor, and indeed this view was shared by Frederick, who said so in writing in a 2011 memo he sent to Stengel.  Nevertheless, Ghosh's background as a war correspondent was clearly valued enough by the TIME managers in New York to reward him with this senior appointment, despite his lack of clear qualities for the specific editorial role. As International Editor, Ghosh's support for McAllester, a fellow male war correspondent, was unwavering.

52.     Ghosh reorganized the structure of TMEL and divided Plaintiff's tasks equally between Plaintiff and her subordinate McAllester as though the two were co-Europe Editors or joint Senior Editors, without any prior discussion with the Plaintiff.  This move was coupled with an implicit grant of wide-ranging authority over TMEL's operations to McAllester.  For example, he was permitted to take key decisions about TMEL without consulting Plaintiff.

53.     Ghosh's actions effectively stripped Plaintiff of responsibilities, removed her authority over McAllester and *de facto* promoted McAllester to Plaintiff's role without providing her with any reason for doing so.  Plaintiff called Ghosh in New York to complain about this, but he did not engage with her concerns, answering her brusquely, ending the calls as soon as possible and sometimes simply asserting that it was his prerogative to re-organize those reporting to him as he saw fit.

54.     In addition to stripping Plaintiff of the authority she had rightly earned and which came with her role as Europe Editor, Ghosh and others in New York, including (then) Deputy Managing Editor Nancy Gibbs ("Gibbs"), began to obstruct Plaintiff's writing career.  They

baselessly killed ideas from Plaintiff and, in a stark departure from Plaintiff's pre-McAllester tenure, edited her work so heavily that its substance and fundamental nature were changed and her brand as a writer was damaged.

55.     One idea that Ghosh and Gibbs, both in New York, "killed" was Plaintiff's cover-length article that had been commissioned by Frederick before his departure, entitled "What If Women Ran the World." Plaintiff -- at the direction of those working for TIME in New York -- had already travelled to Germany, interviewed a government minister and many other senior professionals for the story. Despite this, Plaintiff was told in 2013 by Ghosh that TIME was not interested in any stories about the impact of female success or similar analyses.

56.     Plaintiff was also cut down when she suggested an article on the impact on German women of Angela Merkel's two terms as Germany's chancellor, on the grounds that "stories about women aren't interesting to the wider TIME readership."

57.     In 2013, Ghosh, in New York, also began to deprive Plaintiff of her editorial duties, for example, by stopping her from editing a cover story she had commissioned, which is very unusual, under the pretext of freeing her up for other work.

58.     On May 14, 2013, TIME's efforts to sideline Plaintiff became more visible when Gibbs, who was about to be promoted from Deputy to full Managing Editor in the New York headquarters, sent an email from New York to all editorial staff entitled "Air traffic control," that effectively airbrushed Plaintiff out of her job. The email removed Plaintiff's editorial and managerial powers by identifying to all writers and editorial staff around TIME that McAllester was the go-to editor for all TMEL writers. Meanwhile, Plaintiff was not listed as an editor at all, but simply as a writer who was to submit articles to Ghosh, in New York. The "Air traffic

control" email was sent without consulting or even warning Plaintiff, and without justification. She was shocked when she opened the unexpected message in her inbox.

59.     At the time she was being stripped of her authority by the back door in New York, Plaintiff was simultaneously enjoying recognition and acclaim by others for her work within TIME and was in the middle of a high-pressure, high-profile work assignment covering British Prime Minister David Cameron.  TIME's editors in New York had asked Plaintiff to secure another full sit-down interview with him (her third) and she was the only one to manage this of 23 journalists who had flown with Cameron to New York.  In addition Plaintiff had secured Cameron's agreement to accompany her to the Time Inc. offices in New York to meet high-ranking TIME staff, and allocate several hours to an interview and photo- and video-shoots.  On little sleep, with a migraine prompted by the mounting attacks against her by the editors in New York, Plaintiff still managed to prepare a profile on Cameron immediately upon returning from New York to London.

60.     She submitted the draft to Ghosh in New York, who instead of respecting her judgment about an important story on her own "patch" and editing it lightly (as was normal with other editors), edited the piece to the point of damaging it.  It was riddled with errors and different in kind from Plaintiff's original piece.

61.     Plaintiff worked diligently to fix errors, while trying as far as reasonably possible to align the story with Ghosh's comments.  Ghosh's second round of editing reintroduced numerous errors and further heavy changes of substance and tone, representing Cameron as the savior of the UK's membership of the European Union with the cover line "The Good European."  The piece was so distorted that Plaintiff requested that her name be removed from it,

signaling extremely serious disagreement.  However, Ghosh told her he had already sent the cover to print which included her byline.

62.     Since it was too late to remove her name, Plaintiff did her best to fix Ghosh's new edits but the piece was printed and, as she had expected, it subjected her to mockery and criticism in the UK media and political circles, further damaging her professional reputation and standing.

### Plaintiff is Demoted in Favor of a Younger Man

63.     On May 28, 2013, Ghosh called Plaintiff from New York to tell her that he had decided to give McAllester all of Plaintiff's editing and commissioning powers. He said that there were plans to revise all the titles at TIME, and this might impact the Plaintiff, but he specifically assured Plaintiff that McAllester would not be given her title of Europe Editor. Ghosh told Plaintiff that part of the impetus behind the reorganization was to build up the reputations and brands of TIME's finest writers, nicknamed the "Jedi Knights," which was expected to boost TIME's reputation too.  Plaintiff, Ghosh said, would be among this elite band who would be supported and promoted.  Plaintiff's extensive contacts around the world were also acknowledged, in that Ghosh also asked her to run TIME's "experiential program" of big conferences in the UK.  Ghosh emphasized that this reorganization would allow TIME to promote her unique voice as a writer, and that she should consider her new role a promotion, although it did not carry increased pay or responsibilities.

64.     Nevertheless, Plaintiff knew that removing her commissioning and editing rights would be understood by all within the industry to be a demotion.  Since the pretexts given to Plaintiff for reducing her stature and role did not hold together, Plaintiff objected to Ghosh directly, and to the International Publisher, Andy Bush, in New York, and Shultz, then head of

TIME's HR, based in New York, and now Executive Vice President of Talent and Inclusion for the New York Times.  Plaintiff called Shultz to complain on June 20, 2013.  But Shultz did not advise Plaintiff of her equal opportunity rights or take any action to protect her from the blatant discrimination she was experiencing.

65.     On August 2, 2013, Ghosh called the Plaintiff from New York to say the title of Europe Editor was to be eliminated and she should choose another title for herself, commensurate with a new role that he said TIME New York envisioned for her.  He explained that senior management in New York was reorganizing the global structure of TIME and that the title of Europe Editor would now be obsolete. Ghosh suggested that Plaintiff take on a new title such as "Editor-at-Large" or "Chief European Correspondent" to reflect her new "Jedi Knight" role.  Ghosh cited examples of others who he alleged would be giving up or had given up their titles to assume the "Editor-at-Large" title, naming Rana Foroohar and Belinda Buscombe.  They were all women.  He gave Plaintiff a deadline to comply, by the following Monday.  This was just days after a personal bomb threat she received over Twitter due to her work for TIME that had severely disrupted her life such that she was in the middle of catching up on a backlog of urgent writing deadlines, which Ghosh knew about.   Nevertheless he demanded that she immediately turn her attention to her job title.  In a follow-up to this call, and while considering her job title, Plaintiff emailed Ghosh to ask what her male counterpart, Abdoolcarim, the Asia Editor's new title was going to be since it would make sense for her to have a similar title to that of her Asian counterpart.  Ghosh replied, by email on August 2, 2013, that Abdoolcarim was not in fact being asked to change his title.  Plaintiff thus discovered that despite the supposedly global reorganization that was leading to the disappearance of the Europe Editor title, her male

comparator in Asia, Abdoolcarim, was going to remain Asia Editor.  The reorganization was an attempt to sideline her.

66.     Left with no good choice, Plaintiff picked the new title of Editor-at-Large over the Chief European Correspondent title, but under protest, which she made clear in multiple emails to HR, Ghosh and Gibbs, including ones sent on August 29, September 3 and September 16, 2013.

67.     In light of those protests, until the title change was formally announced, Ghosh repeated his representations and assurances to Plaintiff that TIME's decision to move her to focus more on writing was a promotion and that TIME would feature and support her as one of its star writers.  He repeated his earlier oral assurances in emails that he sent to Plaintiff on:

(a)     August 2, 2013, in which he suggested that Plaintiff might become a "superstar" if she relinquished her editorial role and focused on becoming one of Nancy Gibbs' "Jedi Knight" writers, and would certainly not be excluded from senior management opportunities;

(b)     September 5, 2013, when he sought to allay Plaintiff's concerns by describing her new role as that of a "very important player, not only in London but at TIME" generally, meaning in its New York headquarters and elsewhere, and confirmed that she had "no greater champion in New York" than himself, and describing the evidence of the importance of her new role as "overwhelming;"

(c)     September 13, 2013, when he stated:

> We've spent nearly two months consulting with you on this, and Ellen and I have done our upmost to demonstrate that a change in your title, to editor-at-large, is in no way a demotion. On the contrary, as we've explained, it puts you in highly prestigious company at TIME.
>
> I am confident that once the change is made, you will see that the new title, far from diminishing your status at TIME, will enhance it...

(d)      September 19, 2013, when Ghosh stated: "Catherine, in my book, my

assurances stand for themselves."

68.      Plaintiff justifiably relied upon Ghosh's assurances that the title change was not a

demotion and TIME would devote resources to promoting her as a writer.

69.      Discussions over the precise elements of Plaintiff's new role lasted through

August and well into September 2013.   She sought a job description, but received only a

perfunctory list of tasks from Shultz on August 26, 2013, which omitted any mention of whether

she retained any editorial decision making authority or where she now sat in the corporate

hierarchy.

70.      The announcement of Plaintiff's change of role was made by Nancy Gibbs to all

editorial staff on September 19, 2013, in an announcement of other promotions and hires, and a

formal note from HR was sent to Plaintiff within a few days confirming her change of role.

71.      In breach of the representations made to her by TIME's senior managers in New

York, Plaintiff's "promotion" as one of TIME's elite writers never materialized.   She was not

given any special prominence on TIME's website or resources to advance her writing or brand.

Rather she was unfairly sidelined into a role that TIME would find easier to eliminate in the

future.

### At Same Time Plaintiff is Forced into De Facto Demotion, Younger Men Are Promoted in Europe

72.      On September 5, 2013, having forced Plaintiff to relinquish her job as Europe

Editor, Ghosh emailed Plaintiff from New York to confirm that, despite his initial statements to

the contrary, McAllester was to be formally promoted to Europe Editor.   By this date, Ghosh

treated McAllester's formal appointment to this role and title as inevitable and made no apology

to Plaintiff for reneging on his previous promises that McAllester would not be given this title which indeed Ghosh had assured her was being eliminated. The decision was taken despite the fact that Plaintiff had made it clear to Ghosh that his decision was especially humiliating and painful to her, which she reaffirmed in an email on September 8, 2013.

73.     At about the same time as McAllester's promotion, Simon Shuster ("Shuster"), another male of about McAllester's age and younger than Plaintiff, was appointed by TIME New York and to a different senior role in Europe, as TIME's Berlin Bureau Chief. Plaintiff had close connections with Germany; she worked for the German magazine *Focus* for eleven years prior to joining TIME, speaks and writes fluent German, and continued to cover the country extensively while at TIME. She had originally discussed Shuster's move to Germany as a means to retain his skills because he wished to move from Moscow, where he freelanced for TIME. The idea had been that he would be a wide-ranging correspondent in Europe, strengthening the team. Instead, coming when it did, this change effectively cut off one of Plaintiff's major sources of stories to give them to a younger male, and contradicted TIME's promise in inducing her to become Editor-at-Large that it would enhance her opportunities as a writer. In fact TIME was diminishing them.

### *Harsh Treatment of Plaintiff Continues*

74.     McAllester's promotion to Europe Editor emboldened him, and he used his position of authority to regularly reprimand Plaintiff, revive the complaints about her use of administrative support that he had apologized for in 2012, and to remove her support resources, including any help from Paramaguru for research or travel bookings.

75.     Ghosh, in breach of his promises, did not support Plaintiff's writing.  Instead, he continually rejected her ideas without giving her positive guidance as to the types of stories he wanted.

76.     Plaintiff had worked on a substantial piece on Prince Charles in consultation with Elliott and Frederick, who had both been enthusiastic.  She had spent years building her network of contacts in the royal palaces and then months researching the piece, observing the Prince behind the scenes and sitting down to record a conversation with him at his Scottish home, Birkhall.  However, in the final phases of preparing the piece, Ghosh dismissed it and wanted to downgrade the story to a few pages.  Plaintiff nevertheless completed a draft and shared it with Executive Editor Radhika Jones ("Jones").  Jones agreed with Plaintiff that the story should run as a cover in Europe and went a step further, pressing New York and Gibbs to make it a cover in the domestic and Asia editions as well, which occurred.  At that point, Ghosh complained to the Plaintiff that she had not secured a video element for the website, ignoring his earlier statements to Plaintiff that the piece would not be given prominence and thus would not merit video accompaniment.  In fact, the issue sold well across all regions and received excellent press attention for TIME, as well as a December 2013 book offer from Random House for a full biography on Prince Charles, which Plaintiff, in consultation with TIME managers in New York, accepted.  It required an unpaid sabbatical, but the book was well received when published and enhanced TIME's brand by association with Plaintiff.

77.     Plaintiff continued to provide valuable work that enhanced TIME's reputation throughout 2014.  Among other achievements, she co-wrote a cover story on Francois Hollande, used her excellent contacts to arrange a cover story that Gibbs requested about the band U2 that required significant travel, and at the request of Stephanie Mehta, then Deputy Managing Editor

of TIME's sister publication, *Fortune*, and of the combined TIME and Fortune advertising and events teams in New York, devoted time during her unpaid book sabbatical to line up interviewees, including securing the participation of Nicola Mendelsohn, Vice President of Facebook in EMEA, for the June 2014 Fortune Most Powerful Women summit in London and then conducted on-stage interviews at the event.

78.     Indeed, throughout her employment at TIME, Plaintiff received only excellent employee reviews.  Her New York superiors regularly applauded and relied on her work.

### *McAllester Harasses Plaintiff*

79.     In June 2014, while Plaintiff was still on her book sabbatical, Ghosh left TIME for another position.  This left Plaintiff with no direct manager.  When she returned to work in August 2014, she received an email from Gibbs, the Managing Editor in New York, telling her that McAllester would be her direct manager, and he would report in to New York.  Gibbs was aware of the history between McAllester and Plaintiff, and so should have appreciated the inappropriateness of putting McAllester in direct authority over his former boss whom he had systematically undermined, denounced and said he could not bear.  Making Plaintiff report to him was bound to cause her humiliation and injury.

80.     Plaintiff replied to Gibbs the same day explaining why this was a bad idea and suggesting a work-around: that she report directly to editors in New York, as she had always done.  She received no response.

81.     On November 5, 2014, Plaintiff contacted Reena Sharma of HR, noting that Gibbs had not responded to her email of August 17 and asking for help in resolving her unclear reporting lines.  Two weeks later, Gibbs finally advised Plaintiff, on November 20, 2014, to report to Deputy Managing Editor Michael Duffy ("Duffy") in Washington.

82.     During the more than three months of uncertainty about to whom Plaintiff was to report, McAllester acted as Plaintiff's *de facto* line manager and subjected her to further harassment, including:

(a)     demanding to know where Plaintiff was 24/7;

(b)     requiring her to produce a story for Time.com every day with no regard for her other commitments, on topics that were often far from her areas of expertise;

(c)     humiliating Plaintiff through verbal attacks, requiring her to perform unreasonably taxing work, giving her contradictory orders that regularly upended her work plans and embarrassed her in front of sources, and regularly casting her in a negative light by implicitly contrasting her with Shuster as a model performer.

83.     Even after Duffy was technically assigned to be Plaintiff's manager in November 2014, McAllester told her to continue giving her story pitches to him so he could funnel them to New York and Washington.  In fact, Plaintiff had no substantive professional contact with Duffy before she was terminated in April 2015.  Duffy did not assign her any projects, comment on her work, or update her on business operations.  She saw him only once, by chance, in the London office.

### *TIME Undermines Plaintiff's Performance and Reputation*

84.     TIME undermined Plaintiff's performance and industry reputation in multiple ways including: placing extreme pressure, short notice, and unreasonable time constraints on her work; editing her pieces so as to damage and change their fundamental nature, thus prompting criticism from high-level sources and readers; exploiting Plaintiff's connections and then

harming her reputation with them by making false promises about coverage; and rejecting web story and magazine story suggestions arbitrarily.

### *Plaintiff Experiences Serious Health Issues as a Result of TIME's Treatment*

85.     The conduct of TIME and McAllester caused Plaintiff to suffer from medical issues including extreme stress and migraines so severe that they caused her to dry-heave.  She reported these medical issues and TIME's role in their cause to McAllester as well as to HR.

86.     Plaintiff consulted with her own physician on August 18, 2014 as well as visiting the occupational health advisor recommended to her by HR on September 25, 2014.

87.     Plaintiff's physician at the National Migraine Center recommended that she restrict her work hours.  However, the environment was so hostile towards her that she reasonably feared that doing so would result in further unfavorable comparisons being drawn between her and her younger male colleagues, particularly Shuster.

88.     The occupational health advisor recommended that management work with Plaintiff to implement measures to support her, allow her to "take control over her work," and have her manager meet with her one on one to consider these recommendations.   These recommendations were disregarded by HR and TIME as a whole.

### *TIME Ignored Plaintiff's Complaints About the Discriminatory and Hostile Work Environment*

89.     Throughout her employment, from 2012 to termination, Plaintiff made numerous complaints to her New York managers and/or to HR in New York and London about her discriminatory and unfair treatment by TIME and/or by McAllester, including as follows:

(a)   In July 2012, Plaintiff told Frederick, when he was in New York, that McAllester was undermining her authority, openly disrespecting her style of management and creating tensions among the London staff.  It was ignored.

(b)   In October 2012, after McAllester made baseless complaints about Plaintiff to Frederick in New York, Plaintiff urged Frederick to give her support in managing McAllester, but instead he undermined Plaintiff's position further by requiring her to take remedial coaching.  The leadership coach, Baxter, confirmed on a call to Frederick in New York that McAllester was at least as responsible for tensions as Plaintiff, but McAllester was not requested to see a coach.

(c)   Throughout the period from May to September 2013, Plaintiff made it clear to Ghosh, Shultz (HR) and Gibbs, who were all in New York, that she felt the removal of her Europe Editor title, which was finally given to McAllester in September 2013, was unfair and discriminatory; along with the earlier removal and re-allocation of her commissioning and editing responsibilities to him.

(d)   On August 17, 2014, Plaintiff complained to Gibbs who was in New York that it was inappropriate and wrong for Plaintiff to have to report to McAllester, her former subordinate who had systematically undermined her.

(e)   In August 2014, Plaintiff complained to HR about the unreasonable pressure of McAllester's line management and her resultant migraines.

(f)     Plaintiff again noted the inappropriateness of having to report to and be managed by McAllester to HR on November 5, 2014, when she requested a more appropriate line manager.

90.     By December 2014, Plaintiff concluded she was deliberately being forced out of TIME.  She had been systematically undermined since McAllester was sent to London from New York in June 2012.  The momentum of her sidelining by management in New York increased from May 2013, when she was replaced in her various roles by younger men with lesser experience or weaker qualifications than she, or worse; subjected to McAllester's hostile management; and assigned a supervisor in New York who did not communicate with her.  Now all her article proposals were being rejected without reason.  Plaintiff approached HR to express concern.  She met with Amy Threlfall ("Threlfall"), a London-based HR employee, in December 2014, and relayed this chain of events.  Threlfall did not investigate Plaintiff's complaints, advise her of her rights, or protect her from any additional adverse action.  Threlfall simply told Plaintiff that she "had nothing to worry about."

91.     In fact, this was untrue; Plaintiff's sense that she was being forced out of TIME was accurate and is documented.  Gibbs, accepting wholesale McAllester's pejorative feedback on Plaintiff without investigating its reliability, had been planning with McAllester, Duffy in Washington and HR in both New York and London to dismiss Plaintiff since at least as early as August 2014.  No effort was made by Gibbs to ask Plaintiff for her perspective on McAllester's negative assessment, despite the suggestion by Roxanne Flores, a New York HR employee, that a meeting be convened to gather Plaintiff's perspective -- a suggestion dismissed by others advising Gibbs who did not want Plaintiff approached until a final decision in New York to dismiss her had been taken.  Thus, Gibbs formed her opinion on Plaintiff's worth and made her

decision to fire her based almost entirely on the distorted and discriminatory untruths fed her by McAllester, without giving Plaintiff an opportunity to respond.

92.    TIME's only hesitation and delay in dismissing Plaintiff earlier than April 2015 was its recognition that its discriminatory decision-making might have negative repercussions for TIME, unless carefully dressed up as a "redundancy" with superficial procedural trappings aimed at making a discriminatory discharge look like a simple staff reduction.  Indeed, HR had expressly warned that the proposed dismissal might give Plaintiff grounds to sue for sex discrimination and retaliation since it was accepted that Plaintiff had already made complaints about McAllester's unfair treatment.  Although Gibbs was, or should have been, on notice that McAllester's feedback on Plaintiff might be suspect given HR's warnings, and her own knowledge of McAllester's career rise at Plaintiff's expense, Gibbs still accepted McAllester's view about Plaintiff's performance uncritically, in line with the general favoritism accorded younger male employees at TIME.

### *Plaintiff Is Terminated For Discriminatory and Retaliatory Reasons on the Basis of Her Age and Gender*

93.    On January 6, 2015, Threlfall called Plaintiff into a meeting where Finance Director Mike Taylor ("Taylor") was also present and informed her she was at risk of termination.

94.    During subsequent meetings with Threlfall and Taylor, Plaintiff was given an end date of April 9, 2015.  Plaintiff was advised that her termination was due to a reduction in the work force that made her position redundant, and had nothing to do with her own performance. Specifically, she was told that there was now less interest in European coverage at TIME or for the articles she could provide on British or Western European politics and society, and that the growth area was rapid news pieces for Time.com.  These false justifications were set out in a

document entitled "Business Case for the Proposed Redundancy of Editor-at-Large Position, January 2015," issued by TIME.  They were pretextual.

95.     Europe was and remains an important component of TIME's news coverage as conceived by its New York managers.  In late 2013, TIME managers in New York hired Shuster to head up a new Berlin bureau.  Throughout 2014, Europe was recognized by TIME as a central part of its overall news operation.  In August 2014, even McAllester recognized that the magazine was running low on European stories, and turned to Plaintiff, with her excellent connections and reputation in Europe, to come up with some ideas.

96.     In October 2014, TIME hired Conal Urquhart ("Urquhart"), a personal friend of McAllester of about his same age, to help McAllester with his workload and take on some of Plaintiff's former editorial duties, including the editing of web pieces in London.  This belied the argument used to justify Plaintiff's termination that there was not sufficient work for two senior editors.  There is no reason why Plaintiff could not have been reallocated some of these editorial duties, which she had been performing the previous year, rather than hire a younger and less experienced man and friend of McAllester to do the work.  Urquhart's hire was inconsistent with the claim that TIME was downsizing its European operations.  He was appointed because he was friends with McAllester, not through an open, competitive search process.  Indeed, the HR department recognized and warned Gibbs in an email on November 5, 2014, at 6:15 a.m., that Urquhart's hiring meant that it "would no longer be able to use redundancy as a fair reason to terminate [Plaintiff] and this would mean higher potential costs for terminating her employment if [Gibbs] wanted to still go ahead with that, as [Plaintiff] might even try and claim sex discrimination on top of unfair dismissal."

97.     Even after Plaintiff's departure, TIME has continued efforts to hire staff to take on Plaintiff's writing role.  For example, TIME reached out to see if Anoosh Chakelian, Deputy Web Editor for the *New Statesman,* might be available to cover UK politics for TIME.

98.     The real reason for Plaintiff's termination had nothing to do with a business need, nor with her own performance, which she was consistently told was exemplary.  Instead it was discriminatory and/or retaliatory.  Plaintiff's duties were systematically taken away from her and given to colleagues with less or no more experience or qualifications than her because they were younger and male.  The business review and report provided to Plaintiff during her consultation meetings with HR in early 2015 were merely a cynical prop created to support TIME's pretense that Plaintiff's dismissal was a redundancy resulting from purely business reasons.  It was devised and created after Gibbs had already decided to terminate Plaintiff on the basis of McAllester's discriminatory urgings; and was designed, either by McAllester himself or with input that Gibbs solicited from him, simply to protect TIME from a discrimination lawsuit by Plaintiff it knew was well-founded.  TIME's supposed business rationale for firing Plaintiff was just a smokescreen intended to thwart or obstruct her equal opportunity rights.

99.     Other women have experienced discrimination based on their gender during their employment at TIME, and many more can attest to the hostile work environment and long-established culture of male cronyism at TIME.

### *Plaintiff Suffered Significant Harm Because of the Discrimination and Retaliation She Was Subjected to at TIME*

100.    Plaintiff suffered damages because of the discrimination and retaliation she endured at TIME.

101.    Among the medical issues that TIME's wrongful conduct caused were depression, insomnia, hopelessness, despair, suicidal thoughts, and debilitating migraines.

102.     Plaintiff also suffered professional and financial injuries, including being deprived of the opportunity (1) to excel in senior leadership; (2) for promotion at TIME and corresponding increases in pay and authority; (3) to pursue career advancement outside of TIME; and harm to her reputation as a writer that hurt her professional opportunities.  Given that important European stories were coming up at the time of Plaintiff's termination, such as the 2015 UK election and the 2016 Brexit referendum, which observers would have expected Plaintiff to cover, her sudden departure stoked rumors that TIME must have had some significant professional, not economic, reason to remove her.

103.     The timing of Plaintiff's termination, immediately after the release of her book on Prince Charles of which TIME was fully aware, hurt book sales and her reputation, since many assumed that TIME had terminated her because her research for the book was defective or for other performance-related reasons.  Indeed, this was the implication behind negative coverage given to Plaintiff's departure from TIME in an article published in the *Daily Mail* on April 6, 2015     (http://www.dailymail.co.uk/news/article-3026958/SEBASTIAN-SHAKESPEARE-job-author-revelations-left-Prince-Charles-rattled.html).  The real reason for Plaintiff's termination was not the book or her job performance, but discrimination and/or retaliation by TIME.

### Single Employer and Integrated Enterprise

104.     At all relevant times and in all relevant employment actions, TIME New York, TMEL, and Time Holdings operated as a single-employer and integrated enterprise.

105.     HR policy and final employment decision-making are centralized at TIME New York's offices.  Employment decisions for both TIME New York and TMEL are made by the same individuals in New York.  TIME New York's senior management and HR department in New York had final say over personnel decisions in the London office, including those affecting

Plaintiff. Staff, especially senior staff in London, were treated as an extension of TIME New York's central operations for business planning purposes. For instance, in his proposal for promoting Plaintiff to Europe Editor and hiring McAllester for the London office, Frederick, based in New York, costed out their proposed salaries in US dollars.

106.    The Employee Handbook for TMEL employees permits employees who desire to make a formal protected disclosure to call a US phone number or send an email to a central TIME New York email address. Only informal complaints are handled locally.

107.    TIME maintains HR records and screens and/or tests applicants for employment at TMEL in London, but this is for local convenience and/or compliance purposes, not because TIME New York's management and HR has delegated personnel decisions to staff in London.

108.    TMEL and TIME New York share editorial, administrative, and management personnel. Editors, writers, administrative staff, and officers commonly move between TIME New York and TMEL.

109.    TMEL and TIME New York use each other's office space when working in each other's city.

110.    TIME New York sets quotas that include sales by TMEL.

111.    TIME New York determines a global strategy, which it imposes upon all of its subsidiaries, including TMEL.

112.    TIME New York dictates the terms and conditions of all TMEL digital content subscribers, requiring all TIME Europe (including TMEL) online users to first concede to the application of New York law and "personal and exclusive jurisdiction" in New York for the resolution of any disputes.

113.    Almost all of the content of the European Edition of Time Magazine, for which TMEL is responsible, comes from TIME New York.

114.    Plaintiff was managed by staff from TIME New York based in New York. Plaintiff made all but one of her complaints about her treatment to TIME New York's HR and management staff.

115.    The decisions to demote Plaintiff and promote McAllester were made by Frederick, Ghosh, and Gibbs, all TIME New York employees.   The decision to terminate Plaintiff was made ultimately by Gibbs in New York, after McAllester's discriminatory input.

116.    The business review and corresponding report that served as part of the pretextual basis for Plaintiff's termination emanated from New York, was on TIME New York's letterhead, and used language that demonstrated that it treated its foreign subsidiaries as merely arms of its primary executive office in New York, not as distinct entities.

## CLAIMS FOR RELIEF

## COUNT 1

### TITLE VII – SEX DISCRIMINATION

117.  Plaintiff incorporates and re-alleges each and every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 15 through 116.

118.  Plaintiff was well qualified for each role that she held at TIME and all responsibilities with which she was tasked, including her role as Europe Editor with concurrent senior writer responsibilities, and then as Editor-at-Large.  She performed well in each of these roles.  Each performance review that Plaintiff received was good or excellent, and until Plaintiff challenged the lawfulness of her dismissal post-termination, she was never given any indication by TIME that her performance was in any way defective.

119.  By the acts and practices described above and herein, TIME New York unlawfully discriminated against Plaintiff, a female employee, in the terms and conditions of her employment, on the basis of her gender.

120.  Plaintiff was treated in a disparate and discriminatory manner compared to male employees, in at least the following ways:

(a)  In 2012, Plaintiff was not permitted to recruit her own deputy senior editors, but had her budget frozen for one post after shortlisting four female candidates; and for the other post, had an employee, McAllester, imposed on her by TIME New York's management without an open recruitment process.

(b)   McAllester was selected for the role by Plaintiff's managers because he was a male former war correspondent and so one of a favored predominantly-male or male-only group at TIME New York.

(c)   Far from providing Plaintiff with a supportive senior editor as her deputy as agreed so that she could excel in her new role as Europe Editor with added senior writer responsibilities, TIME New York gave her a deputy, McAllester, who undermined her and looked to oust her from the start, and TIME empowered him to behave in this manner and to succeed in doing so.

(d)   TIME New York did nothing in July 2012 when both Plaintiff and another employee, Adams, raised concerns about McAllester's conduct.

(e)   TIME New York failed to discipline McAllester when he made what were acknowledged to be baseless complaints against Plaintiff, in October 2012; instead, TIME New York required Plaintiff to attend remedial coaching from December 2012 to February 2013, but not McAllester.

(f)   On May 14, 2013, TIME managers in New York sent a group email to all editorial and writing staff entitled "Air Traffic Control" directing all writers to pitch stories to McAllester, instead of to Plaintiff (despite her position as Europe Editor and McAllester's boss), and listed Plaintiff only as a writer. This unexpected public demotion or dismissal from her job as Europe Editor was highly damaging to Plaintiff's reputation within the organization. The decision was taken to promote and benefit McAllester at Plaintiff's expense because McAllester was one of a favored male group.

(g)  TIME confirmed this decision in May 2013, when it told Plaintiff that it wanted her to relinquish her editorial and commissioning duties to McAllester, even though her performance in role was never criticized, and indeed TIME acknowledged that it had nothing to do with poor performance on her part.

(h)  In June 2013, Plaintiff complained about her unfair and disparate treatment to HR in New York, but TIME took no action to protect her or even to investigate.

(i)  In August 2013, Plaintiff was ordered to change her title from Europe Editor to something else on the basis that TIME New York was now abandoning the title of Editor for its regional editions, even though her male counterpart retained his title as Asia Editor.

(j)  In September 2013, TIME New York formally promoted McAllester into Plaintiff's former position, and gave him the title of Europe Editor, in spite of its previous assurance to Plaintiff that she was not being removed from that job so that McAllester could take it on.  In this way, through a series of stealthy steps and outright deception, TIME succeeded in removing Plaintiff from her post, despite excellent past performance, and promoting her younger male subordinate into it.

(k)  Throughout the rest of 2013 up to her termination date in 2015, Plaintiff was made to report to and pitch her article ideas to McAllester, her former subordinate who disdained her, a humiliation not visited on any of her comparable male colleagues.  He was now only in a position of authority

over her because TIME had unlawfully removed her from post to make way for him.

(l)    In late 2013, TIME decided to create a Berlin bureau and place another younger male former war correspondent, Shuster, in that post so that he could write on German politics and society, an area in which Plaintiff had particular expertise, thus removing yet more work from her role and giving it to a younger male employee.

(m)   In October 2014, TIME recruited one of McAllester's friends, Urquhart, a man of similar age to McAllester and younger than Plaintiff, to take over some of Plaintiff's former editorial duties that TIME had told her were no longer necessary, instead of returning them to her.

(n)    In January 2015, TIME put Plaintiff on notice that it was considering dismissing her, in response to an alleged need to reduce the workforce.  It did not even consider dismissing either of the two men in London, McAllester or Urquhart, who had less experience than her, were less versatile as writers and editors, and had been hired more recently.

(o)    TIME's dismissal of Plaintiff.

121.   As a result of Defendant's discriminatory actions, Plaintiff has and/or will continue to suffer irreparable injury including: losses in past and future compensation and earning capacity, humiliation, mental anguish, migraines, emotional distress and damage to reputation.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

122.   Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

123.   Plaintiff requests relief as described in the Prayer for Relief below.

**COUNT 2**
**TITLE VII - HOSTILE WORK ENVIRONMENT**
**ON THE BASIS OF GENDER**

124.   Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 15 through 116.

125.   By the acts and practices described above, Plaintiff was subjected to a hostile work environment on the basis of her gender.   Plaintiff was subjected to severe and pervasive acts of unwelcome and/or offensive conduct on the basis of her gender, which have created a hostile work environment.   In addition, the cumulative effect of the acts of discrimination also created a hostile work environment for Plaintiff.

126.   The hostile, offensive, and discriminatory treatment that Plaintiff was subjected to by TIME included, without limitation:

(a)   TIME's decision, through Frederick and any other senior New York manager who approved his recruitment decisions in 2011 and 2012, to foist McAllester on Plaintiff, supposedly in a subordinate role of support for her, when in fact Frederick and TIME's favoritism towards McAllester empowered him to use the opportunity to undermine Plaintiff and seek her job for himself, an ambition TIME supported and rewarded by giving him that job in 2013.

(b)   all the actions taken by McAllester to undermine Plaintiff's authority as Europe Editor in 2012 and early 2013, which produced turmoil in the office and made Plaintiff's management duties more complex, including:

    (i)   in July 2012, when McAllester tried to persuade junior staff to provide him with negative comments about Plaintiff, which he could to persuade managers in New York that he should replace her;

    (ii)   in July 2012, when McAllester told a junior member of staff that he "can't bear" Plaintiff;

    (iii)   from June 2012 to the date of Plaintiff's termination in 2015, each and every time McAllester rolled his eyes, sighed, or used other forms of body language to denote irritation and disrespect towards Plaintiff;

    (iv)   each and every time McAllester as Plaintiff's deputy bypassed Plaintiff – his boss – and took editorial or management questions directly to editors in New York without consulting her;

    (v)   in 2012, McAllester's overbearing and discriminatory treatment of junior staff which he hid from Plaintiff in order to create unease and distrust of her among them;

    (vi)   in 2012, each and every time McAllester made a disparaging remark about Plaintiff to her or to junior or senior employees, including complaining about her time-keeping; her absence from the office on print deadline nights; her use of her mobile phone; and her general demeanor or personal qualities;

(vii)  in September 2012, when McAllester made a knowingly baseless and sexist complaint about Plaintiff to Frederick, calling her a "diva;"

(viii) in 2012-13, when McAllester encouraged junior staff (including Paramaguru, the assistant Plaintiff hired with the blessing of TIME managers in New York to provide administrative support) to ignore Plaintiff's instructions, even when this threatened Plaintiff's ability to meet TIME's filing deadlines.

(c)    all the individual events from the "Air Traffic Control" email on May 14, 2013 to the appointment of McAllester into Plaintiff's position in September 2013, by which TIME removed Plaintiff from a position in which she was performing well to replace her with her subordinate, including the series of representations Ghosh made to persuade Plaintiff to accept TIME's actions that were subsequently broken, all of which caused her distress and humiliation.

(d)    From 2013 to the date of her termination in 2015, the humiliation Plaintiff experienced in having to pitch article ideas to her former subordinate and answer to his pressing and unreasonable demands about her work, her time-keeping and her schedule; and hear herself unfavorably compared to younger male colleagues in comparisons that ignored her productivity, record and work quality.

(e)    From August to November 2014, when Gibbs instructed Plaintiff to report directly to McAllester despite knowing how McAllester had undermined and replaced her; and then Gibbs ignoring Plaintiff's complaint about this

management line for over three months, during which Plaintiff had to endure McAllester's bullying and harassment as her *de facto* manager.

(f) Each time Plaintiff's well-founded article ideas or pitches were routinely rejected by Ghosh or Duffy or other editors in New York despite Ghosh's earlier promise that TIME would promote Plaintiff's writing career.  This reinforced Plaintiff's view that TIME had decided to sideline her, as an older female employee, and was ready to breach promises given.

(g) Each time Plaintiff was told by editors in New York that TIME was not interested in articles about women, since Plaintiff did not believe this to be evidence-based or true and simply demonstrated bias, which reinforced her experience of being in a disfavored group.

(h) Each time Ghosh or other editors in New York edited Plaintiff's articles so heavily as to change their fundamental sense, which would be attributed to her when the piece was published; and each time Ghosh simply sent heavily edited articles to press without Plaintiff's approval such that she was subjected to negative comments by important sources or others in the industry after publication.

(i) The hiring of Urquhart, a friend of McAllester, to perform writing and editorial tasks that Plaintiff used to do and was well qualified to do, just before TIME argued that Plaintiff's role was no longer necessary and that her skills were not needed.

(j)    The opening of the Berlin bureau and installation of a younger former war correspondent as chief, which removed an important stream of Plaintiff's work and was also humiliating.

(k)    TIME's failure to honor its promise to promote her brand as a writer in 2013, when it actually did nothing to promote her, and instead undercut her efforts to produce quality pieces.

(l)    TIME's notice to Plaintiff in January 2015 that she had been selected for dismissal because of a purported need to reduce the workforce, when TIME admitted that Plaintiff was the only employee being made "redundant." TIME did not dismiss either of the two men, McAllester or Urquhart, who had less experience than Plaintiff, were less versatile as writers and editors, and had been hired more recently.

(m)    Time's dismissal of Plaintiff in April 2015.

127.  The unlawful treatment of Plaintiff was motivated by her gender, and it was pervasive, occurring frequently and over a period of years.

128.  This abusive and hostile behavior and treatment of Plaintiff was objectively and subjectively hostile and abusive, such that it caused emotional distress to Plaintiff and physical injury, in the form of debilitating migraines, and interfered with her reputation and employment. No reasonable person in Plaintiff's position would be expected to tolerate the hostile conditions to which Plaintiff was subjected.

129.  As a result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, physical injury, emotional distress

and reputational damage. As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

130. Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

131. Plaintiff requests relief as described in the Prayer for Relief below.


## COUNT 3
## ADEA: AGE DISCRIMINATION

132. Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 15 through 116.

133. Plaintiff is, and at all relevant times was, over forty years old.

134. Plaintiff was well qualified for each role that she held at TIME and all responsibilities that she was tasked with, including her role as Europe Editor and concurrent senior writer responsibilities.

135. By the acts and practices described above and herein, TIME New York unlawfully discriminated against Plaintiff, an employee over the age of forty, in the terms and conditions of her employment, because of her age.

136. Each of the acts of discriminatory treatment described above and listed in summary form in paragraph 120, as examples of sex discrimination, Plaintiff re-alleges here as examples also or alternatively of age discrimination.

137. Plaintiff was treated in a disparate manner compared to male employees, was demoted from a role she was qualified for because of her age, and was ultimately unlawfully terminated from a role she was qualified for because of her age.

138.    Plaintiff was replaced, initially *de facto*, and then formally by a younger, male employee.

139.    As a result of Defendant's discriminatory actions, Plaintiff has and will continue to suffer irreparable injury: losses in past and future compensation and earning capacity; humiliation, mental anguish, and emotional distress; injury to reputation and physical injury in the form of debilitating migraines.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

140.    Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

141.    Plaintiff requests relief as described in the Prayer for Relief below.

## COUNT 4
## ADEA - HOSTILE WORK ENVIRONMENT
## ON THE BASIS OF AGE

142.    Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 15 through 116.

143.    By the acts and practices described above and herein, Plaintiff was subjected to a hostile work environment because of her age.  Plaintiff was subjected to severe and pervasive acts of unwelcome and/or offensive conduct on the basis of her age, which have created a hostile work environment.

144.    The hostile, offensive, and discriminatory treatment, that Plaintiff was subjected to at the hands of TIME included, without limitation, all of the acts described in summary form at paragraph 126 above.  Each and every act listed as contributing to Plaintiff's hostile work environment on the basis of gender, is re-alleged here also or alternatively as an act contributing

to hostile work environment on the basis of age.  The unlawful treatment of Plaintiff was because of her age, as well as gender, and was pervasive, occurring frequently and over a period of years.

145.    This abusive and hostile behavior and treatment of Plaintiff was objectively and subjectively hostile and abusive, such that it caused her emotional distress, physical injury in the form of debilitating migraines and interfered with her reputation and employment.   No reasonable person in Plaintiff's position would be expected to tolerate the hostile conditions to which she was subjected.

146.    As a result of Defendant's discriminatory actions, Plaintiff has suffered losses in compensation, earning capacity, humiliation, mental anguish, and emotional distress.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

147.    Defendant's unlawful actions were intentional, willful, malicious and/or done with reckless disregard for Plaintiff's rights.

148.    Plaintiff requests relief as described in the Prayer for Relief below.


**COUNT 5**

**RETALIATION FOR ENGAGING IN A PROTECTED ACTIVITY
IN VIOLATION OF TITLE VII AND THE ADEA**

149.    Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 15 through 116.

150.    Plaintiff engaged in protected activities, including without limitation, all the complaints Plaintiff made to TIME listed at paragraphs 89 and 90 above.

151.    TIME retaliated against Plaintiff for engaging in the protected activities by continuing to unlawfully discriminate against her, continuing to subject her to unwelcome hostile

treatment on the basis of her age and sex, and ultimately, terminating Plaintiff for unlawful and discriminatory reasons on April 9, 2015.

152.    As a result of Defendant's discriminatory actions, Plaintiff has and will continue to suffer irreparable injury, losses in past and future compensation and earning capacity; humiliation, mental anguish, physical injury in the form of debilitating headaches and emotional distress and injury to reputation.  As a result of those actions and consequent harms, Plaintiff has suffered such damages in an amount to be proved at trial.

153.    Plaintiff requests relief as described in the Prayer for Relief below.


## COUNT 6
## FRAUDULENT MISREPRESENTATION UNDER NEW YORK LAW

154.    Plaintiff incorporates and re-alleges every allegation set forth in the preceding paragraphs as if set forth here in full, and points in particular to paragraphs 15 through 116.

155.    TIME fraudulently induced Plaintiff to take on additional responsibilities, remain employed with TIME, and forgo other employment opportunities by knowingly omitting material facts, and making material misrepresentations of present fact that TIME knew to be untrue at the time they were made.

156.    The misrepresentations and omissions made by TIME were as follows:

    (a)    statements made by Frederick, in New York, to Plaintiff in late 2011 and early 2012, that Plaintiff would be provided and allowed to select two Senior Editors to support her in role if she accepted the dual Europe Editor/senior writer role, and omissions that he had in fact already selected one person for the Senior Editor role, McAllester, whose ambitions and expectations of special treatment by his war correspondent friend, Frederick,

were unlikely to make him suitable to support Plaintiff in her post.   (*See also* paragraph 25); and

(b)   statements and omissions made by Ghosh to Plaintiff by telephone from New York on May 28, 2013 and subsequently confirmed and/or reiterated by phone and email in August and September 2013, as described above in paragraphs 63 - 73 and incorporated here, that:

(i)   McAllester was not and would not become Plaintiff's supervisor, and would not be appointed to the Europe Editor role once she relinquished it;

(ii)   TIME wanted Plaintiff to relinquish her title of Europe Editor because it was restructuring its business to eliminate all regional editor titles, i.e, both Europe Editor and Asia Editor;

(iii)   TIME wanted Plaintiff to yield her editorial duties to McAllester in 2013 and relinquish her title as Europe Editor in order to promote and enhance her brand as one of TIME's special "Jedi Knight" writers; and

(c)   multiple affirmations from Ghosh to Plaintiff that she was not and would not be demoted, including in his telephone calls to Plaintiff from New York on May 28 and August 2, 2013 and confirmed in his subsequent emails to Plaintiff: on August 2, 2013 at 2:32 p.m., September 5, 2013 at 10:42 a.m., September 13, 2017 at 6:17 p.m., and September 19, 2013 at 4:48 p.m.

157.   The above statements or omissions were false at the time they were made because Frederick and Ghosh respectively made them to Plaintiff, knowing that he specifically or TIME had no intention to fulfill them and did not believe they were true.  TIME defrauded Plaintiff on

each occasion in order to advance the career of a favored male employee, an objective its senior management evidently considered a concrete benefit, however misguidedly and unlawfully. Further, TIME defrauded Plaintiff in 2013 insofar as it sought her agreement to relinquish her position as Europe Editor, as part of its general plan to sideline her so it could portray her eventual discriminatory dismissal as a redundancy.   In this way, however unlawful and discriminatory, TIME perceived itself as receiving concrete benefits from its fraud because it would allow it to clear a path to promote a favored younger male employee.

158.    TIME's intent, through its employees Frederick and Ghosh, is demonstrated by their conscious behavior after Plaintiff had relied on their misrepresentations and omissions; behavior which was inconsistent with a genuine intention to fulfill their promises to Plaintiff when they were made or belief that they were true.

159.    Frederick's statements in 2012 that Plaintiff would be provided with and allowed to select two supportive senior editors were untrue because:

(a)    Frederick had already decided to hire McAllester into the Senior Editor position in London, as evidenced by an email he wrote to Elissa Fishman, of TIME's News Business Unit, on December 20, 2011, and a further email he wrote to Richard Evans in International Management, and copying Ellen Shultz, of TIME's HR, on December 30, 2011, before inducing Plaintiff to rely on his promise that she would be permitted to select her own supportive editors in 2012;

(b)    as soon as Plaintiff tried to select her own supportive editors she was told that the budget for one position was frozen and that McAllester -- someone she had not selected and who had not been selected by Frederick through an

open recruitment process -- would be provided to her for the other position, (*see also* paragraphs 30 - 36); and

(c)    the one senior editor foisted on Plaintiff by Frederick, McAllester, proved to be wholly unsupportive, as was inevitable given his clear ambition and the favored treatment he was accorded by Frederick, Ghosh and Gibbs and was led to expect at TIME, as alleged with particularity throughout the General Allegations, especially from paragraph 32 to 116.

160.    Secondly, Ghosh's statements in 2013 made to persuade Plaintiff to relinquish her Europe Editor title and role were untrue because:

(a)    within just a few months of Ghosh stating to Plaintiff that McAllester would not be given the title of Europe Editor and stating that this title was being eliminated by TIME, and within only about a month of Ghosh telling Plaintiff to select a new title for herself other than Europe Editor for these reasons, Plaintiff received an email from Ghosh himself stating that McAllester had been given the title of Europe Editor, which would not in fact be eliminated by TIME (*see also* paragraph 72);

(b)    despite promising Plaintiff that her role as Editor-at-Large was considered a promotion by TIME and would be supported by additional resources to promote her brand as one of TIME's finest writers, TIME failed to support Plaintiff in all the ways outlined throughout the General Allegations from paragraphs 63 to 116, including by:

(i)    Ghosh subjecting her written drafts to such a heavy-handed edit that their sense, meaning and accuracy were distorted to the point that

Plaintiff was subjected to external criticism after the piece was published; actions which took place at almost the same time as Ghosh was simultaneously telling Plaintiff that her voice as a writer would be promoted and supported by TIME, and so belied the honesty of his representation that Plaintiff would be promoted as a star writer and her reputation as a writer championed (*see also* paragraphs 59 - 62);

(ii)     damaging Plaintiff's reputation by sending her drafts to print bearing her name, while their meaning and accuracy were compromised by Ghosh's editing, such that the reader would attribute Ghosh's edits to Plaintiff, and she would be subjected to external criticism, as indeed she was (*see id.*).  Again, this happened in or around the period in 2013 when Ghosh was telling Plaintiff that TIME was going to support her brand as one of its finest writers if she would relinquish her Europe Editor role but belied the honesty of his representations;

(iii)    forcing Plaintiff to pitch her stories to McAllester after Ghosh's departure in 2014 and through her termination date (*see* paragraphs 79 - 83), despite his history of animosity, bullying and discrimination towards Plaintiff, and the fact that TIME had succeeded in replacing her with McAllester by means of false representations (*see also* paragraphs 63 - 73).

(iv)    from August to November 2014, forcing Plaintiff to report directly to McAllester, which subjected her to a period of particularly intense

bullying and humiliation, as was wholly foreseeable in the circumstances (*see also* paragraphs 79 - 83);

(v)     from the time of the misrepresentations made in 2013 to the end of her employment in April 2015, TIME did not provide any extra support to Plaintiff to promote her as one of its star writers but instead subjected her to the many instances of discrimination, harassment, bullying and retaliation set out above in paragraphs 71 to 116;

(vi)    ignoring Plaintiff's complaints of harassment and bullying, as set out in paragraphs 89 and 90 above; and

(vii)   dismissing Plaintiff under the pretext of a "redundancy," when really it was the product of its own discrimination or retaliation, as set out in paragraphs 89 to 99. TIME was better able to spin Plaintiff's termination as a "redundancy" only because TIME itself had sidelined her into the role of Editor-at-Large, a move that made Plaintiff vulnerable to dismissal precisely because TIME, contrary to Ghosh's representations, had never considered her new role as a promotion or one that would make her one of its most valued star writers.

161.    TIME made these material misrepresentations and omissions to Plaintiff to induce Plaintiff to rely on them to her detriment.

162.    Plaintiff reasonably and detrimentally relied on each of TIME's 2012 misrepresentations and omissions by accepting the combined Europe Editor/senior writer role in 2012.  In accepting this role, Plaintiff suffered the following actual losses:

(a)    the loss of the salary that would have been due to her and she would have demanded for performing the two roles of Europe Editor and Senior Writer simultaneously without the help of two supportive senior editors.   In reliance on Frederick's promises of two supportive editors, Plaintiff was willing to accept a lower salary for her dual role than she would have accepted had Frederick not made these promises;

(b)    the chance to perform this combined role to her best potential, which would likely have led to further promotion, in line with her past career trajectory at TIME, losses which can be calculated by reference to TIME's own actual pay structures;

(c)    the chance of accepting any other senior editor job opportunity at another publication where she would have been supported and valued, such that she would now still be in a full-time senior editorial role with a major publication, losses which can be calculated by reference to actual industry-average pay scales; and

(d)    out of pocket costs associated with the emotional and psychological distress she would have avoided had Frederick not induced her to rely on his fraudulent representations including sessions at the National Migraine Centre in London, medication, therapy costs and travel to therapy.

163.   Plaintiff reasonably and detrimentally relied on each of TIME's 2013 misrepresentations and omissions by accepting the role of Editor-at Large in 2013, albeit under protest.  In accepting this role, Plaintiff suffered the following actual damages:

(a)   the loss of the professional and financial benefits associated with the Europe Editor role.  Had Plaintiff not relied on Ghosh's misrepresentations and omissions she would either have still be Europe Editor now, since this position has not been eliminated by TIME, or she would have been able to seek damages as if she had still been Europe Editor in 2013 for being unlawfully removed from that position by TIME.  This loss can be calculated by reference to the salary and benefits Plaintiff was actually earning as Europe Editor, compared to the salary she actually earned after relying on Ghosh's fraudulent statements;

(b)   the opportunity to seek any other senior editor job opportunity at another publication in which Plaintiff would have been supported and valued, such that she would now still be in a full-time senior editorial role with a major publication, losses which can be calculated by reference to actual industry-average pay scales;

(c)   the loss of any job at TIME, since TIME only dismissed Plaintiff once she had been fraudulently induced into accepting the Editor-at-Large role from which TIME could more plausibly eliminate her on the pretext of redundancy.  In this way, TIME's fraudulent misrepresentations were the direct and proximate cause of Plaintiff's actual dismissal and all losses flowing from it; and

(d)  the emotional and psychological distress of being fraudulently induced into accepting her own sidelining and *de facto* demotion under McAllester, leading to his reasonably foreseeable harassment and bullying and her dismissal.  This distress was wholly foreseeable at the time the fraudulent representations were made because Plaintiff told Ghosh during their phone calls on May 28 and August 2, 2013 and in her email to him on September 8, 2013, at 2:34 p.m., that the process was "unbelievably painful" and "humiliating."

(e)  out of pocket costs associated with TIME's unlawful treatment of Plaintiff during her employment and after dismissal, including sessions at the National Migraine Centre in London, medication, therapy costs and travel to therapy.

164.    As a direct and proximate cause of the fraudulent representations and material omissions, Plaintiff suffered damages, including, but not limited to, compensatory damages, damage to her professional reputation, lost wages, benefits and other financial losses, and emotional distress.

165.    TIME's omissions and express misrepresentations constitute gross, wanton, and/or willful fraud.

166.    Plaintiff requests relief as described in the Prayer for Relief below.

## **DEMAND FOR JURY TRIAL**

167.    Plaintiff respectfully demands a trial by jury as to all matters so triable pursuant to Fed. R. Civ. Pro. 38.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully demands judgment against Defendant TIME awarding:

(f)     Damages in amounts to be established at trial, including without limitation, damages for past, present, and future emotional pain and suffering, ongoing and severe mental anguish and physical injury in the form of debilitating migraines, compensation for harm to reputation, loss of past, present and future enjoyment of life, and past and future lost earnings and earning capacity;

(g)     Punitive damages;

(h)     Costs and expenses;

(i)     Attorneys' fees pursuant to 42 U.S.C. § 2000e and 29 U.S.C. § 216(b);

(j)     Pre- and post-judgment interest; and

(k)     Such other and further relief as the Court may deem just and proper.


Dated: November 24, 2017

                                        Respectfully submitted,


                                        BY:     s/ Frederic C. Weiss

                                        Frederic C. Weiss
                                        (FCW-0010)
                                        124 East 55th Street, 4th Floor
                                        New York, New York 10022.
                                        Telephone: (212) 223-0555
                                        Facsimile: (212) 223-8338
                                        Email: fredweisslaw@gmail.com

BY:     s/ Stephen G. Grygiel

Stephen G. Grygiel
(SG4935)
Silverman Thompson Slutkin White, LLC
201 N. Charles Street, Suite 2600
Baltimore, MD 21201
Telephone: (410) 385-2225
Facsimile: (410) 547-2432
Email: sgrygiel@mdattorney.com

BY:     s/ Ann McAllister Olivarius

Ann McAllister Olivarius
*(Application to SDNY pending)*
NY Bar License 4608972
McALLISTER OLIVARIUS
63 Putnam Street
Saratoga Springs, New York 12866
Telephone: (518) 633-4775
Facsimile: (781) 658-2480
Email: aolivarius@mcolaw.com

*Counsel for Plaintiff*